1996 SD 37

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Joaquin Jack RAMOS, Defendant and Appellant.**

**No. 19065.**

Supreme Court of South Dakota.

Argued Nov. 28, 1995.

Decided April 3, 1996.

Mark Barnett, Atty. Gen., Gary Campbell, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Mark DeBoer, Office of the Public Defender, Rapid City, for defendant and appellant.

SABERS, Justice.

[¶ 1] Ramos appeals a life sentence for first degree manslaughter as unconstitutional cruel and unusual punishment. We affirm.

## FACTS

[¶ 2] On February 21, 1994, Ramos returned from a bar to the home he shared with his girlfriend, Debbie Martines, and her children. Debbie was not present when he arrived and after asking the children where she was, Ramos determined she had taken a cab to the bar. He called on a cab radio for the driver to bring her back. Ramos became violent while awaiting her return and threatened Johnny Jibben, the co-worker who had given him a ride home. Jibben's wife arrived, went into the house and took the two children outside. Ramos claims Jibben yelled at the children to get into the car, and Ramos went to the door and yelled at them to return.

[¶ 3] Ramos stated Jibben attacked him, but Jibben testified Ramos continued to threaten and swing at him. When Debbie arrived home Jibben was holding Ramos down on the floor. Debbie told Jibben she could handle the situation and asked him to let Ramos up. Ramos then slapped Debbie and threw a table. Jibben left the house and Debbie went out to bring the children back inside. Ramos went to get his gun. Debbie tried to stop him from going to the door and he grabbed her hair and hit her with the hand holding the gun. The gun discharged and Debbie was shot and killed.

[¶ 4] Ramos was charged with second degree murder or, alternatively, first degree manslaughter. He was evaluated by a psychiatrist and the trial court ordered an examination at the Human Services Center.

[¶ 5] Ramos pled guilty to first degree manslaughter pursuant to a plea agreement. There was no agreement as to the length of the sentence. Sentencing was continued to allow counsel to provide additional information and because of a misunderstanding regarding the plea agreement. The presentence report indicated the State recommended a life sentence. The Deputy State's Attorney explained that he intended to leave the decision of a sentence to the court, and that he did not specifically recommend a life sentence. Ramos entered a stipulation waiving his right to a jury trial

and allowing his guilty plea to stand. The trial court sentenced him to life imprisonment. Ramos made two motions for reconsideration of sentence and a motion to withdraw his guilty plea, all of which were denied by the trial court. Ramos appeals, asking this court to allow withdrawal of his guilty plea or to reverse or vacate his sentence.

### 1. Is Ramos' life sentence unconstitutional?

[¶ 6] Ramos argues his life sentence is unconstitutional cruel and unusual punishment because it is either manifestly disproportionate to the crime or shocks the conscience. The maximum sentence for first degree manslaughter is life imprisonment. SDCL 22–6–1; *See* SDCL 22–16–15.

"On appeal, we first determine whether the sentence 'shocks the conscience' or is so disproportionate to the crime that it activates the Eight Amendment 'within and without jurisdiction' proportionality tests." It is settled law in this state that absent a sentence which is so excessive in duration that it shocks the conscience of the court, a sentence that is within statutory limits is not reviewable on appeal. This court has developed a two-fold test to determine whether the sentence is so constitutionally offensive as to shock the conscience:

First, is the punishment so excessive or so cruel, 'as to meet the disapproval and condemnation of the conscience and reason of men generally.' And second, whether the punishment is so excessive or cruel as to shock the collective conscience of this court.

*State v. Kaiser,* 526 N.W.2d 722, 726 (S.D. 1995) (citations omitted).

[¶ 7] The first test is whether Ramos' sentence "meets the disapproval and condemnation of the conscience and reason of men generally." Ramos argues other states do not allow life sentences for voluntary manslaughter and presents statutes from outside this jurisdiction to show that only in South Dakota and Oklahoma is it statutorily possible to receive a life sentence for voluntary manslaughter.[1] The State claims there is no uniformity among the other states in possible manslaughter sentences. The State also argues the legislature has designated only six felonies for which a maximum of life imprisonment is allowed, and points out Ramos' crime involved a killing, a firearm and mortal endangerment of the lives of all present.

[¶ 8] "Public intent is reflected in the legislative acts defining the permissible punishment for specific crimes." *State v. Pack,* 516 N.W.2d 665, 668 (S.D.1994) (quoting *State v. Phipps,* 318 N.W.2d 128, 132 (S.D.1982) *ap-*

---

1. This appears to be a proportionality argument given this court's discussion in *State v. Ferguson,* 519 N.W.2d 50, 54–55 (S.D.1994) and the United States Supreme Court's discussion in *Harmelin v. Michigan,* 501 U.S. 957, 986–87, 111 S.Ct. 2680, 2697, 115 L.Ed.2d 836, 859 (1991). Because Ramos claims his sentence shocks the conscience, he argues a proportionality review is necessary. He presents thirty manslaughter cases from South Dakota, three of which resulted in life sentences. He argues his case can be distinguished from each of the three.

It is unclear whether a proportionality test is ever reached by this court. Ramos claims comparison of other states' statutes is a factor in considering whether South Dakota statutes allow a punishment that shocks the conscience of men generally. Given the language of *State v. Pack,* 516 N.W.2d 665, 668 (S.D.1994), which says public intent is "reflected in the legislative acts defining the permissible punishment for specific crimes," this argument seems sound. The language of *Pack* is not limited to a survey of South Dakota's legislative acts, and therefore may be open to consideration of statutes of other states.

Disproportionality may simply be a factor for consideration in determining whether the sentence shocks the conscience of this court.

In *Pack,* 516 N.W.2d at 669, this court held the sentence did not shock its conscience and therefore did not reach the proportionality analysis. However, in *Ferguson,* 519 N.W.2d at 54, this court found Ferguson's sentence did not shock its conscience, but refrained from entering a proportionality discussion because no disproportionality data had been given to the trial court. In *Bult v. Leapley,* 507 N.W.2d 325, 328 (S.D. 1993) (*Bult II*) this court held because the sentence shocked its conscience, there was no need for proportionality review. "Whether the Eighth Amendment even encompasses a proportionality principle in non-capital cases has been called into question by the United States Supreme Court." *Bult II,* 507 N.W.2d at 328, n. 2 (citing *Harmelin,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836). We generally agree in view of the fact that proportionality review is a legislative option even in capital cases. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

*peal dismissed*, 406 N.W.2d 146 (S.D.1987)). The South Dakota legislature allows a sentence of life imprisonment for voluntary manslaughter. SDCL 22–6–1. This is within their legislative prerogative. A minority position among state legislatures does not necessarily mean an *un*constitutional or even an *un*acceptable position. For these and the reasons stated hereafter, Ramos' sentence does not "meet the disapproval and condemnation of the conscience and reason of men generally."

■ [¶ 9] The second test is whether the punishment is so excessive or cruel as to shock the collective conscience of this court. In developing an appropriate sentence,

> the sentencing court should " 'acquire a thorough acquaintance with the character and history of the man before it.' " This study should examine a defendant's "general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record."

*State v. Chase in Winter*, 534 N.W.2d 350, 354 (S.D.1995) (quoting *Pack*, 516 N.W.2d at 667–68 (S.D.1994) (citations omitted)).

[¶ 10] The trial court heard testimony and read letters from several parties before sentencing.[2] The trial court also read a psychiatric evaluation in which the doctor found Ramos "oriented, alert and responsive." He was "tearful in discussing Debbie's death and preoccupied with her loss." Ramos showed symptoms of post-traumatic stress disorder. He was also experiencing guilt related to causing the death of an innocent person he loved, but the doctor felt it was guilt appropriate to the situation. The psychiatric eval-

uation reveals Ramos attempted an overdose of a prescribed drug while in jail.

[¶ 11] The trial court stated it considered all the testimony, but focused on the issue of Ramos' need for control:

> When one drops back and focuses on your life as a whole, however, we come to the point where there is an element of control, a need to control, a desire to control that you cannot control.

[¶ 12] The trial court considered Ramos' past relationships and determined that, "when they have been good, [they] have been very, very good. When they are bad, they are very, very bad."[3] The trial court called attention to the "danger side" of Ramos' personality which "surfaced ... when Debbie Jo Martines died."

[¶ 13] The trial court noted Ramos' prior offenses have been misdemeanors. It stated, "When one looks at the nature of the offenses, however, they all have some degree of violence associated with them, Mr. Ramos, violence largely centered around those individuals that you supposedly hold near and dear and, ... involve women." The trial court pointed out, "[t]he instances in which you lose control have become more frequent."

■ [¶ 14] Ramos claims his life sentence should shock the conscience of this court because a life sentence differs from a term of years sentence. *State v. Holloway*, 482 N.W.2d 306, 311 (S.D.1992); *State v. Weiker*, 366 N.W.2d 823, 825 (S.D.1985) (*Weiker II*). This court discussed life sentences (imposed on habitual offenders) in *State v. Weiker*, 342 N.W.2d 7 (S.D.1983) *cert. denied*, 465 U.S.

---

2. Many letters were received from Debbie's family and on Ramos' behalf. Ramos' father indicated Ramos felt Debbie had helped him change his life.

    Ramos' employer, Mike Bridges, wrote about how he and Ramos worked on Ramos' self-esteem. Bridges wrote, "I feel he was making steady progress." He noted that when Ramos met Debbie, "he really cleaned his act up."

    Bishop Lorenzo Kelly, chaplain for the jail, worked with Ramos after Debbie's death. He wrote:

    > I've seen such a turn around in this young man, and from the depths of my heart and soul I do not believe that he is a murderer. I do

believe that this was an accident, and I believe that in our talking and reading together that he also knows the detriment of drinking ... Jack has a desire to steer other young people away from the path that he was once on....

The trial court acknowledged Bishop Kelly's position, but disagreed with the assertion that Ramos wasn't a danger to society.

3. Ramos' ex-wife, Angela Ramos, wrote a letter to the trial court which indicated Ramos had been emotionally and occasionally physically abusive to her. The trial court also noted a relationship with Brenda Hartman, in which both parties were abusive.

1069, 104 S.Ct. 1422, 79 L.Ed.2d 747 (*Weiker I*). The purposes of sentencing are retribution, deterrence, both individual and general, and rehabilitation. *Weiker I*, 342 N.W.2d at 11 (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). This court has also recognized incapacitation as a valid sentencing goal. *State v. Gehrke*, 491 N.W.2d 421, 425 (S.D.1992) (citing *Harmelin v. Michigan*, 501 U.S. 957, 999, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836, 868 (1991)). One purpose is not preeminent over any of the others. "[T]here is nothing in the Constitution that says that 'rehabilitation' is the sole permissible goal of incarceration[.]" *Atiyeh v. Capps*, 449 U.S. 1312, 1314, 101 S.Ct. 829, 830, 66 L.Ed.2d 785, 788 (1981) (per Chief Justice Rehnquist as Circuit Justice). There is no constitutional principle that prefers rehabilitation over deterrence as a sentencing goal. *Fielding v. LeFevre*, 548 F.2d 1102, 1108 (2d Cir. 1977).

[¶ 15] The following observation regarding retribution as a sentencing goal was made by Justice Potter Stewart:

I cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.

*Furman v. Georgia*, 408 U.S. 238, 308, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346, 389 (1972) (Stewart, J., concurring).

[¶ 16] However, this court has stated, "[n]o matter how much one may desire to prevent recurrence of criminal behavior in our crime-ridden society, a sentencing court must individually evaluate each offender in light of the required sentencing factors, including rehabilitation." *State v. Bult*, 529 N.W.2d 197, 200 (S.D.1995) (*Bult III*) (citing *Gregg*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859).

[¶ 17] A life sentence "completely eschews the goal of rehabilitation." *Bult II*, 507 N.W.2d at 327 (citing *Weiker I*, 342 N.W.2d 7). "[A] term of years allows for rehabilitation and allows [defendant] hope." *State v. Ferguson*, 519 N.W.2d 50, 54 (S.D.1994) (citations omitted). In *Bult II*, this court stated that a life sentence should only be imposed when a trial court:

can determine from the facts of the principal offense and the previous convictions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that the interests of society demand that the convict be kept off the streets for the rest of his life; *and that society, speaking through the legislature, has clearly mandated that the offense or offenses involved are so malignant that a lifetime of incarceration is the only adequate retribution.*

*Bult II*, 507 N.W.2d at 327–28 (quoting *Weiker I*, 342 N.W.2d at 12). (Italics ours. See text *infra.*).

[¶ 18] When discussing Ramos' principal offense, the trial court stated, "I understand that you aren't here as a murderer. You are here for an offense of first degree manslaughter, and I have tried to examine this sentence in that light." The trial court noted this was Ramos' first felony conviction and addressed the issue of rehabilitation:

I think, until it reaches a point in time that you are able to control those emotions, control your desire to control those people around you, that the interest of rehabilitation cannot be addressed, and it appears to me that the goal of rehabilitation in this case cannot be achieved for a very, very long time, and that you must forfeit your right to be free in society for a substantial period of time in order to protect society.

[¶ 19] Whether Ramos is capable of rehabilitation was a fact question to be decided by the trial court. *Weiker II*, 366 N.W.2d at 825 (citing *U.S. v. Hollis*, 718 F.2d 277, 279–80 (8th Cir.1983), *cert. denied* 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984)). There was no expert testimony or solid evidence that Ramos *was* capable of rehabilitation. The trial court found Ramos incapable of rehabilitation until he could control his desire to control the people around him. Es-

sentially, this appears to be a conclusion that rehabilitation is so remote or improbable that a life sentence is warranted. In view of this evidence or lack thereof, we cannot say the trial court erred.

[¶ 20] The trial court considered Ramos' danger to society as the next factor, stating, "I think the danger that you represent to society is epitomized by the manner in which you handle your relationships with people." The court noted:

> That night, in my mind, is a control issue ... The control issue only had to rise to a certain point with you in your relationships with a spouse or a loved one because you had power and authority over them. You didn't have that related to ... Mr. Jibben and you thought you needed to get a gun, and that, Mr. Ramos, in my mind, is the distinction in this case.

Although these statements are not a detailed finding that the interests of society demand Ramos "be kept off the streets for the rest of his life," they are sufficient to support the sentence.

[¶ 21] Although the italicized sentence in the *Bult II* paragraph quoted above provides that society mandate a life sentence as the only adequate retribution, we find the provision excessive and in error. Since life imprisonment is the maximum punishment for a Class 1 felony under SDCL 22-6-1 and no minimum is provided, numerous options are available and a life sentence need not be "the only adequate retribution." It is only necessary that the sentence not constitute excessive retribution. Therefore, we modify the italicized sentence of the *Bult II* paragraph quoted above to provide: and that the life sentence not constitute excessive retribution. We conclude that it has not been shown that this life sentence constitutes excessive retribution.

[¶ 22] Additionally, we have reviewed the arguments and authorities concerning proportionality and have determined they are not sufficiently persuasive to shock our conscience under these circumstances.

[¶ 23] In view of all of the above, this life sentence does not shock the conscience of this court under these circumstances. We affirm on this issue.

## 2. Did the State violate the terms of the plea agreement?

[¶ 24] Ramos claims he was the victim of prosecutorial misconduct because the State violated its plea agreement at the sentencing hearing when it did not identify the death of Debbie Martines as "accidental." The State indicated Martines' death was not premeditated, but argued Ramos made decisions which led to her death. Ramos claims this violated the plea agreement, either directly or by failing to abide by the spirit of the agreement.

[¶ 25] A portion of the plea agreement was read at Ramos' plea. It stated:

> If Mr. Ramos will enter a plea of guilty to the offense of First Degree Manslaughter ... the State would agree to dismiss [the alternative counts of second degree murder]. I believe this would accurately reflect the fact that the killing of Debbie Martine[s] was involuntary while it would also acknowledge that the killing was neither excusable nor justified and was accomplished by means of a deadly weapon.

The State reserved the right to present aggravating facts to the trial court, and later stated by letter:

> [I]t is my belief and in fact was the reason for both the charge and the plea offer that has been made that the death of Debbie Martine[s] was accidental *in that I do not have any reason to believe that Jack Ramos intended or contemplated her death as a result of the actions which he took. I also believe, obviously, that certain deliberate choices by Mr. Ramos led to her death in that he chose to retrieve the firearm, knew or should have known that it was loaded, contemplated either scaring or even shooting at John Jibben and struck Ms. Martine[s] with the hand in which he held the firearm.*

(Emphasis added).

[¶ 26] State's comments at sentencing included:

> I do obviously agree with certain things with the defense in this case. *We agreed, both by the charge and obviously by the*

*plea agreement, this is not a premeditated act.* Jack Ramos did not go to get the gun having decided to kill Debbie Jo Martines ... [W]hat I ask you to consider finally, ... is that, while this was not a decision made to kill Debbie Jo Martines, that it was the act and the decision perhaps more importantly of Jack Ramos that led us down this path, that created in Jack a homicide waiting to happen.

The defendant decided to get drunk knowing from his own experience with himself, ... that, when he was drunk, he became violent. He decided to become rowdy at the bar and to challenge people to take him. He decided when he got home to become verbally abusive in front of the children ... He decided that he had to scare either John Jibben or [the cab driver who drove Debbie home] ... He decided that he was going to get a gun that he knew was loaded. He decided that he was going to ... physically abuse Debbie Jo Martines ... first by grabbing her by the head, ... and then ultimately taking a loaded pistol and pistol whipping her with the butt of it. He made those decisions.

A very difference in one sense from deciding to kill someone. In another sense there is no difference at all.

[¶ 27] The State's argument to the trial court basically reflected the agreement and the letter to Ramos' counsel. Ramos did not establish a violation of the plea agreement or prosecutorial misconduct.

[¶ 28] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

