1996 SD 54

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Rick PULFREY, Defendant and Appellant.**

No. 19064.

Supreme Court of South Dakota.

Considered on Briefs Nov. 30, 1995.

Decided May 8, 1996.

Mark Barnett, Attorney General, Patricia J. Froning, Assistant Attorney General, Pierre, for plaintiff and appellee.

Michael Stonefield, Office of the Public Defender, Rapid City, for defendant and appellant.

SABERS, Justice.

[¶ 1] Pulfrey appeals a life sentence for first-degree manslaughter as unconstitutional cruel and unusual punishment. We affirm.

## FACTS

[¶ 2] On the evening of October 15, 1993, Pulfrey and Wendy Powell, his girl friend of eight years were at their home watching television and drinking alcohol. They got into an argument, which escalated into a physical fight, with both parties striking each other. At some point, Pulfrey claimed Wendy bit him on the leg. He became very angry and hit and kicked Wendy multiple times in the chest and abdomen. Pulfrey dragged Wendy to the door and threw her onto the porch. A neighbor noticed Wendy lying on the porch and called Pulfrey, who let her back into the house. He noticed she was wheezing and having trouble breathing. Pulfrey called his mother, Helen, and asked her to come over. When she arrived, she asked whether Wendy wanted to go to the hospital, but Wendy indicated she only wanted to get away from Pulfrey. Helen took Wendy to her home and helped her into a bedroom. When Helen awoke the next morning and went to check on Wendy, she discovered Wendy was dead. An autopsy revealed numerous bruises and scrapes over Wendy's body. She also had extensive internal injuries, including lacerations to her liver and one kidney, multiple fractures to her ribs, and a bruise on her right lung. Death was caused by internal bleeding from blunt force injuries to her abdomen and chest. In effect, she was kicked to death.

[¶ 3] Pulfrey was interviewed by police officers the morning after Wendy was killed. He told one officer that he and Wendy had been fighting and it got out of hand. He stated he asked Wendy to leave, but she would not, which "set [him] off." When asked why he "lost it," he responded: "[Because] I was drinking, seems like every time we drink, it seems like we end up in a fight ... I mean sometimes I'd start it sometimes she'd start it." The officer asked why he continued to kick her after she stopped fighting. Pulfrey initially claimed it was due to alcohol. The officer told him, "... you can't blame this all on drinking[.]" Pulfrey responded he had "mental problems," that he was schizophrenic, and that alcohol set it off.

[¶ 4] Pulfrey was diagnosed with paranoid schizophrenia in 1988. Dr. Stephen Manlove evaluated Pulfrey's state of mind the night of the fight and his competency to stand trial. Dr. Manlove indicated it was likely that Pulfrey was mentally ill the night of the fight and that Pulfrey told him that voices told him to "get [Wendy] before she got him."

[¶ 5] Pulfrey pled guilty but mentally ill to first-degree manslaughter and was sentenced to life imprisonment. He filed a motion for reconsideration of sentence which was denied. He appeals.

[¶ 6] **1. Is Pulfrey's life sentence unconstitutional?**

[¶ 7] Pulfrey argues his life sentence is unconstitutional cruel and unusual punish-

ment because it is either manifestly disproportionate to the crime or shocks the conscience. The maximum sentence for first-degree manslaughter is life imprisonment. SDCL 22–6–1; *see* SDCL 22–16–15.

> "On appeal, we first determine whether the sentence 'shocks the conscience' or is so disproportionate to the crime that it activates the Eighth Amendment 'within and without jurisdiction' proportionality tests." It is settled law in this state that absent a sentence which is so excessive in duration that it shocks the conscience of the court, a sentence that is within statutory limits is not reviewable on appeal. This court has developed a two-fold test to determine whether the sentence is so constitutionally offensive as to shock the conscience:
>
>> First, is the punishment so excessive or so cruel, 'as to meet the disapproval and condemnation of the conscience and reason of men generally.' And second, whether the punishment is so excessive or cruel as to shock the collective conscience of this court.

*State v. Kaiser*, 526 N.W.2d 722, 726 (S.D. 1995) (citations and quotations omitted).

1. This appears to be a proportionality argument given this court's discussion in *State v. Ferguson*, 519 N.W.2d 50, 54–55 (S.D.1994) and the United States Supreme Court's discussion in *Harmelin v. Michigan*, 501 U.S. 957, 986–87, 111 S.Ct. 2680, 2697, 115 L.Ed.2d 836, 859 (1991). Because Pulfrey claims his sentence shocks the conscience, he argues a proportionality review is necessary. He presented thirty manslaughter cases from South Dakota, three of which resulted in life sentences. He argues none of those cases are factually similar to his. He also points out that only one of the thirty defendants was found guilty but mentally ill, as was Pulfrey. That defendant was committed to the Human Services Center, pursuant to SDCL 23A–27–45.

It is unclear whether a proportionality test is ever reached by this court. Pulfrey claims comparison of other states' statutes is a factor in considering whether South Dakota statutes allow a punishment that shocks the conscience of men generally. He claims that by considering only the South Dakota statute, this prong of the test becomes meaningless. Given the language of *State v. Pack*, 516 N.W.2d 665, 668 (S.D.1994), which says public intent is " 'reflected in the legislative acts defining the permissible punishment for specific crimes,' " this argument seems sound. The language of *Pack* is not limited to a survey of South Dakota's legislative acts, and

[¶ 8] The first test is whether Pulfrey's sentence "meets the disapproval and condemnation of the conscience and reason of men generally." Pulfrey argues other states do not allow life sentences in voluntary manslaughter cases. He presents statutes from outside this jurisdiction to show that only in South Dakota and Oklahoma is it statutorily possible to receive a life sentence for voluntary manslaughter.[1]

[¶ 9] " 'Public intent is reflected in the legislative acts defining the permissible punishment for specific crimes.' " *State v. Pack*, 516 N.W.2d 665, 668 (S.D.1994) (quoting *State v. Phipps*, 318 N.W.2d 128, 132 (S.D.1982), *appeal dismissed*, 406 N.W.2d 146 (S.D.1987)). The South Dakota Legislature allows a sentence of life imprisonment for voluntary manslaughter. SDCL 22–6–1. Pulfrey points out that this court in *Bult v. Leapley*, 507 N.W.2d 325 (S.D.1993) *(Bult II)* held the sentences shocked the consciences of men generally as well as this court, though within the statutory maximum. However, this court has also stated, " '[e]very felony sentence is not subjected to exhaustive review; generally, a sentence within the statutory maximum is not disturbed.' " *Kaiser*, 526 N.W.2d at 726 (quoting *State v. Reed*,

therefore may be open to consideration of statutes of other states. Disproportionality may simply be a factor for consideration in determining whether the sentence shocks the conscience of this court. *State v. Ramos*, 1996 SD 37, ¶ 7 n. 1, 545 N.W.2d 817.

In *Pack*, 516 N.W.2d at 669, this court held the sentence did not shock its conscience and therefore did not reach the proportionality analysis. However, in *Ferguson*, 519 N.W.2d at 54, this court found Ferguson's sentence did not shock its conscience, but refrained from entering a proportionality discussion because no disproportionality data had been given to the trial court. In *Bult v. Leapley*, 507 N.W.2d 325, 328 (S.D.1993) *(Bult II)*, this court held because the sentence shocked its conscience, there was no need for proportionality review. "Whether the Eighth Amendment even encompasses a proportionality principle in non-capital cases has been called into question by the United States Supreme Court." *Bult II*, 507 N.W.2d at 328 n. 2 (citing *Harmelin*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836). We generally agree in view of the fact that proportionality review is a legislative option even in capital cases. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

451 N.W.2d 409, 410 (S.D.1990)). Pulfrey has failed to establish grounds for reversal under this test.

[¶ 10] The second test is whether the punishment is so excessive or cruel as to shock the collective conscience of this court. In developing an appropriate sentence,

> "the sentencing court should ' "acquire a thorough acquaintance with the character and history of the man before it." ' This study should examine a defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record."

*State v. Chase in Winter*, 534 N.W.2d 350, 354 (S.D.1995) (quoting *Pack*, 516 N.W.2d at 667–68 (citations omitted)).

[¶ 11] Pulfrey has been convicted of two felonies (both third-degree burglary) and other crimes, including tampering with a motor vehicle, driving while intoxicated (three offenses), possession of drug paraphernalia, refusing to leave, and disorderly conduct. He was on parole until March 1993.

[¶ 12] Pulfrey began hearing voices in 1987 and was diagnosed with paranoid schizophrenia in 1988. He states he has been an alcohol abuser since he was a teenager. He completed a chemical treatment program in 1990. He underwent mental health counseling from 1990 to 1993, and medication was prescribed. When he was released from parole supervision in 1993, he stopped taking his medication regularly and began to drink.

[¶ 13] In his statement to police on October 16, 1993, the morning of Wendy's death, Pulfrey did not mention hearing voices. Dr. Manlove held two interviews with Pulfrey on December 6 and December 9, 1993. Pulfrey told him he decided to stop taking the medication in March 1993 because he planned to drink and use drugs again. Pulfrey said he heard voices again and by late summer or early fall, they were present almost every day. Pulfrey told Dr. Manlove that on the night of Wendy's death voices told him "essentially to get her before she got him throughout the altercation." Dr. Manlove indicated:[2]

> It seems likely that Mr. Pulfrey was mentally ill at the time of the alleged offense. He has a chronic mental illness, schizophrenia, which [preceded] the events 10/15/93. He had been off of his medications since March of 1993 and he reports that his psychotic experiences had worsened since being off the medications. This was further complicated by use of alcohol and other substances.

[¶ 14] The trial court considered all of the above information in sentencing Pulfrey.

---

**2.** In discussing whether Pulfrey was incapable of knowing the wrongfulness of his act, Dr. Manlove indicated Pulfrey intended to remove Wendy from the house by harming her, but "state[d] he never intended to kill [her]." He continued:

> The insanity issue is complicated by Mr. Pulfrey's description of the voices telling him to get her before she got him and his description of not remembering much of the assault. The extent to which the voices contributed to the assault is made less clear by the fact that he did not mention it in his first statement to law enforcement officers following the assault.
> If one buys [Pulfrey's] story that he does not recall most of the assault following the first few blows and that the auditory hallucinations pushed him to be more aggressive than he would have otherwise been one would need to entertain an insanity defense. If one does not buy that story one could not argue for an insanity defense. In that case one would have to simply say that a fight got out of hand and an assault took place which was probably more devastating than Mr. Pulfrey had intended.

Manlove later asked Pulfrey why he did not mention the voices in his police interview. Pulfrey said the police never asked about them. Manlove indicated "[t]his is consistent with his fairly concrete response to situations he finds himself in."

Pulfrey was admitted to the Human Services Center in January, 1994. He was evaluated by Dr. Grant, who wrote:

> Mr. Pulfrey suffers from schizophrenia and heard voices. The voices encouraged him to assault his wife. However, several points need to be made.
> 1. This was one of a succession of fights during which there was physical contact, and he had heard voices during other fights as well. Rather than being driven by a psychotic condition, his behavior was driven by irritation towards his wife for drinking, and then for biting him. Therefore, I cannot endorse his statement that he did what he did because of the voices.

Pulfrey has not challenged the trial court's knowledge of his character and history.

[¶ 15] Pulfrey claims his life sentence should shock the conscience of this court because a life sentence differs from a term of years sentence. *State v. Holloway*, 482 N.W.2d 306, 311 (S.D.1992); *State v. Weiker*, 366 N.W.2d 823, 825 (S.D.1985) *(Weiker II)*. This court discussed life sentences (imposed on habitual offenders) in *State v. Weiker*, 342 N.W.2d 7 (S.D.1983) *(Weiker I)*. The goals of sentencing are retribution, deterrence, both individual and general, and rehabilitation. *Weiker I*, 342 N.W.2d at 11 (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). This court has also recognized incapacitation as a valid sentencing goal. *State v. Gehrke*, 491 N.W.2d 421, 425 (S.D.1992) (citing *Harmelin v. Michigan*, 501 U.S. 957, 999, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836, 868 (1991)). One purpose is not preeminent over any of the others. "[T]here is nothing in the Constitution that says that 'rehabilitation' is the sole permissible goal of incarceration[.]" *Atiyeh v. Capps*, 449 U.S. 1312, 1314, 101 S.Ct. 829, 830, 66 L.Ed.2d 785, 788 (1981).

[¶ 16] A life sentence without parole deters the convict from committing crime and exacts retribution. *Bult II*, 507 N.W.2d at 327; *Weiker I*, 342 N.W.2d at 11. The following observation regarding retribution as a sentencing goal was made by Justice Potter Stewart:

> I cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.

*Furman v. Georgia*, 408 U.S. 238, 308, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346, 389 (1972) (Stewart, J., concurring).

[¶ 17] However, this court has stated, "[n]o matter how much one may desire to prevent recurrence of criminal behavior in our crime-ridden society, a sentencing court must individually evaluate each offender in light of the required sentencing factors, including rehabilitation." *State v. Bult*, 529 N.W.2d 197, 200 (S.D.1995) *(Bult III)* (citing *Gregg*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859).

[¶ 18] A life sentence "completely eschews the goal of rehabilitation." *Bult II*, 507 N.W.2d at 327 (citing *Weiker I*, 342 N.W.2d 7). "[A] term of years allows for rehabilitation and allows [defendant] hope." *State v. Ferguson*, 519 N.W.2d 50, 54 (S.D.1994) (citations omitted). In *Bult II*, this court stated that a life sentence should only be imposed when a trial court:

> 'can determine from the facts of the principal offense and the previous convictions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that the interests of society demand that the convict be kept off the streets for the rest of his life; *and that society, speaking through the legislature, has clearly mandated that the offense or offenses involved are so malignant that a lifetime of incarceration is the only adequate retribution.*'

*Bult II*, 507 N.W.2d at 327–28 (quoting *Weiker I*, 342 N.W.2d at 12). In *State v. Ramos*, 545 N.W.2d 817 (1996), ¶ 21, this court replaced the italicized language to provide, "and that the life sentence not constitute excessive retribution."

[¶ 19] The trial court stated, "I think you ... would have [changed things that night], had you been able to control what was going on, control yourself as far as your medication." The trial court stated:

> [W]hen you were in a controlled environment or on probation and knew what the requirements were, ... you took your medication and ... you did well. You were able to function day to day. You were able to function with your family, and you had no legal involvements. It appears from your actions and the record, that as soon as that probation was over, instead of acknowledging the situation that you were in, continuing to take medication and try to control as best as possible your mental

diagnosis ... there is apparently no known cure for your particular situation. There is only the best hope of controlling it through medication and the best efforts of the patient to maintain.

Lacking your desire to put your best effort into it, to quit medication, go back to drinking, having the continual bouts with the voices telling you that people are out to get you, your reference to the night in question where you were afraid that Wendy was going to get you all of which, of course, we know not to be the fact.

It is your inability to control yourself by medication which put us in this situation. When considering the factor of rehabilitation, it is an unknown quantity. It cannot be quantified as to if and when there will be a sufficient ability on your part to manage your mental state.

Based on the entire record, particularly mental health records that are a part of the case that have been stipulated to by counsel and the nearly one year since this event, the fact that this case was not rushed because it needed time to work out and to arrive at an adequate mental and medical diagnosis as to your condition, that I have the benefit of those records, given the inability to fashion a sentence based solely on mental health aspects in the State of South Dakota[.]

■ [¶ 20] The trial court sentenced Pulfrey pursuant to SDCL 23A–27–38,[3] which provides for further examination and treatment for his mental illness. The trial court's sentence of life imprisonment at the penitentiary was, "to include treatment by the health officials." The court stated:

I would hope your transfer is to the Department of Human Services for treatment at Yankton, and that their recommendation be given to the Secretary of Corrections and the Board of Pardon and Paroles for further determination in your sentence.

Whether Pulfrey is capable of rehabilitation was a fact question to be decided by the trial court. *Weiker II*, 366 N.W.2d at 825 (citing *United States v. Hollis*, 718 F.2d 277, 279–80 (8th Cir.1983), *cert. denied*, 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984)). The trial court found that Pulfrey's capability for rehabilitation was unknown. There was no evidence in the record that, without constant supervision, Pulfrey would continue to take medication to control his condition. In light of the rehabilitation evidence before the trial court, Pulfrey has not shown the trial court erred.

■ [¶ 21] The second factor is whether the interests of society demand that Pulfrey be kept off the streets. The trial court noted Pulfrey's prior offenses were property offenses, "in my mind, totally unrelated to the incident." The trial court stated, "[i]t establishes on a minimal basis some anti-social behavior on your part, but doesn't set a pattern of violence and of acting out towards others." As stated above, the trial court also considered the interests of society in sentencing Pulfrey to life unless he can prove to the Board of Pardons and Parole that he can manage his mental illness. The trial court also considered Pulfrey's failure to control his condition when his probation ended, but included professional treatment in the life sentence. The trial court considered that Pulfrey needed a controlled environment. It also considered Pulfrey's danger to society and stated Pulfrey should look for executive clemency, and to the Board of Pardons and Parole "once the Department of Human Services can quantify and, in some manner assist you in maintaining mental stability. Failing that, society is protected, because you have been deprived of your liberty."

---

3. SDCL 23A–27–38 provides:

If a defendant is found "guilty but mentally ill" or enters that plea and the plea is accepted by the court, the court shall impose any sentence which could be imposed upon a defendant pleading or found guilty of the same charge. If the defendant is sentenced to the state penitentiary, he shall undergo further examination and may be given the treatment that is psychiatrically indicated for his mental illness. If treatment is available, it may be provided through facilities under the jurisdiction of the department of human services. The secretary of corrections may transfer the defendant from the penitentiary to other facilities under the jurisdiction of the department of human services, with the consent of the secretary of human services, and return the defendant to the penitentiary after completion of treatment for the balance of the defendant's sentence.

[¶ 22] Although these statements are not a detailed finding that the interests of society demand Pulfrey "be kept off the streets for the rest of his life," they are sufficient to support Pulfrey's life sentence.

■ [¶ 23] The third factor is whether the life sentence constitutes excessive retribution. *Ramos*, 1996 SD 37 at ¶ 21, 545 N.W.2d 817. Pulfrey claims the life sentence is excessive because the killing was in the heat of passion, after a mutual fight. He points out there was no deadly weapon involved and that Wendy was conscious after the fight. He also notes that Wendy refused medical treatment and that no one involved knew her injuries would lead to death. The State points out that Pulfrey essentially kicked Wendy to death. We conclude Pulfrey did not show that his life sentence was excessive retribution.

■ [¶ 24] Additionally, we have reviewed the arguments and authorities concerning proportionality and are satisfied that Pulfrey's sentence was not manifestly disproportionate to the crime and does not shock our conscience under these circumstances. *See supra* note 1; *Ramos*, 1996 SD 37 at ¶ 22, 545 N.W.2d 817; *Ferguson*, 519 N.W.2d at 54–55.

[¶ 25] In view of all of the above, this life sentence does not shock the conscience of this court under these circumstances. We affirm.

[¶ 26] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ, concur.

