1997 SD 59

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Roger Allen RAYMOND, Defendant and Appellant.**

**No. 19710.**

Supreme Court of South Dakota.

Considered on Briefs March 27, 1997.

Decided May 21, 1997.

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

James A. Eirinberg, Sioux Falls, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] Roger Raymond was convicted of sexual contact with a minor under the age of 16 (SDCL 22–22–7) and of being a habitual offender; he was sentenced to life in prison without possibility of parole. He appeals the whole of the judgment of conviction and sentence. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] This is the second time Raymond has been before this Court on the same charge of sexual contact with a child under the age of 16. We reversed his June 29, 1994 felony conviction and remanded for a new trial, holding that the State denied Raymond a fair trial by introducing inadmissible expert testimony to bolster the credibility of the victim. *State v. Raymond (Raymond I)*, 540 N.W.2d 407 (S.D.1995).

[¶ 3.] At the time of the retrial, Raymond continued to be represented by court-appointed counsel Richard Russman. Russman successfully defended Raymond on his appeal to this Court, and had represented Raymond at the habitual offender phase of his first trial.[1]

[¶ 4.] On April 10, 1996, Raymond requested that Russman be removed as his counsel and that Raymond be allowed to represent himself at the retrial. Raymond informed the trial court of his confidence he could proceed pro se in a competent manner:

> Your Honor, I can handle this case just fine. Under the circumstances I know everything about it. I've had a year with it. I know exactly what's going on with it.

The trial court then recommended to Raymond that he at least retain a lawyer to assist him in his pro se defense if he felt the need. Raymond adamantly refused.

> DEFENDANT: Your Honor, I don't want that.
>
> COURT: Are you absolutely sure you don't want that?

---

1. Raymond's original court-appointed attorney, H.I. King, petitioned the court to withdraw after the sexual contact verdict, and was replaced by Russman.

DEFENDANT: I'm absolutely positive, Your Honor, beyond a shadow of a doubt.

COURT: And there is nothing that I can say that would

make you change your mind?

DEFENDANT: No, sir.

The trial court heard the motion and recessed for 24 hours to take the request under advisement. After reconvening, the trial court advised Raymond in detail of the consequences of serving as his own attorney. When Raymond indicated he still wanted to proceed pro se, the trial court granted the motion, concluding that Raymond had knowingly and intelligently waived his right to counsel.

[¶ 5.] The trial court also took a second step of ordering Raymond to undergo a psychological evaluation to determine if he was competent to go to trial. A third attorney, Tony Portra, was appointed to represent Raymond solely on the competency issue. At the competency hearing, the examining psychiatrist, Dr. William Pettit, told the court that in his opinion, Raymond was not mentally ill, had a rational and factual understanding of the charges against him, was able to understand the nature and consequences of the proceedings against him and was able to conduct his own defense. Portra advised the court that Raymond had ordered him not to contest his competency.

[¶ 6.] At trial, Raymond conducted his own defense, but elected not to testify. A jury again convicted him on the sexual contact charge, which involved sexual touching of a seven-year-old girl. The trial court found that it was not necessary to retry Raymond on the habitual offender charge, since it was not overturned on appeal. The trial court took judicial notice of the first habitual offender trial and the presentence investigation prepared for that hearing. Raymond was sentenced to life without parole.

## ANALYSIS AND DECISION

[¶ 7.] **1. Whether Raymond was competent to knowingly, intelligently, and voluntarily waive counsel?**

[¶ 8.] A criminal defendant's motion to represent himself involves "two mutually exclusive constitutional rights: the right to be represented by an attorney, and the right NOT to be represented by an attorney." *Hamilton v. Groose*, 28 F.3d 859, 862 (8th Cir.1994), *cert. denied*, 513 U.S. 1085, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995) (emphasis original). Neither the United States Constitution nor the South Dakota Constitution requires counsel to be forced upon a defendant. *State v. Thomlinson*, 78 S.D. 235, 237, 100 N.W.2d 121, 122 (1960); *see also* SDConstArt VI, § 7. Forcing an attorney upon an unwilling defendant not only serves no constitutional purpose, it may also violate the defendant's right to defend himself. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). "An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction." *Id.* at 821, 95 S.Ct. at 2534, 45 L.Ed.2d at 573.

[¶ 9.] Nonetheless, a defendant's right to waive counsel and defend himself has serious consequences, and is not to be taken lightly. This Court previously has held that the accused has a right to defend himself without the aid or assistance of an attorney so long as the accused is mentally competent and not under a legal disability. *Thomlinson*, 78 S.D. at 238, 100 N.W.2d at 122–23. A defendant is presumed not to have waived his right to counsel unless he can demonstrate to the court that his waiver and request to represent himself is knowing, intelligent, and voluntary. *Hamilton*, 28 F.3d at 861–62.

[¶ 10.] We must examine the particular facts and circumstances of each case in order to determine if there has been a knowing and intelligent waiver of the right to counsel. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). We consider the background, experience, and conduct of the accused, including whether the defendant is well experienced with the legal system. *Id. See also State v. Van Sickle*, 411 N.W.2d 665, 667 (S.D.1987).

[¶ 11.] Although a defendant does not need to have an attorney's skill and experience to competently and intelligently choose to represent himself, the court should make him

aware of the pitfalls of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268, 275 (1942). While in some cases there may be a record showing a defendant is aware of the problems of self-representation, " 'an admonition from the trial court is preferred as it eliminates any doubt.' " *State v. Cashman,* 491 N.W.2d 462, 463 (S.D.1992) (quoting *Van Sickle,* 411 N.W.2d at 667).

[¶ 12.] This Court has suggested the trial court warn defendants of five factors engendered by the *Faretta* court:

(1) that "presenting a defense is not a simple matter of telling one's story," but requires adherence to various "technical rules" governing the conduct of a trial;

(2) that a lawyer has substantial experience and training in trial procedure and that the prosecution will be represented by an experienced attorney;

(3) that a person unfamiliar with legal procedures may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, may not make effective use of such rights as the voir dire of jurors, and may make tactical decisions that produce unintended consequences;

(4) that a defendant proceeding pro se will not be allowed to complain on appeal about the competency of his representation; and

(5) "that the effectiveness of his defense may well be diminished by his dual role as attorney and accused."

*Van Sickle,* 411 N.W.2d at 666–67 (quoting R. LaFave, *Criminal Procedure* § 11.5 (1984)).[2]

[¶ 13.] In the case at bar, the trial court went through each of the five factors with Raymond. Each time the trial court explained one of the pitfalls of self-representation, Raymond was asked if he understood. Each time Raymond was unequivocal in stating that he did.[3] At the conclusion of the warnings, the trial court asked Raymond:

Trial Court: With all of those explanations, do you still want to proceed, Mr. Raymond, and act as your own counsel?

Raymond: Yes, I do, your Honor.

Trial Court: And you've thought about this for a considerable length of time, have you?

Raymond: Yes, I have, your Honor.

[¶ 14.] This Court has held that a waiver is constitutionally acceptable even if the trial court does not issue the *Van Sickle* warnings when other circumstances indicate the accused was fully aware of the dangers of self-representation. *Van Sickle,* 411 N.W.2d at 667. Those indicia include the defendant's involvement in previous criminal trials, his representation by counsel before trial, and his explanation of his reasons for proceeding pro se. *Id.* In the case at bar, Raymond was not inexperienced with the legal system. He had been arrested 32 times, convicted 28 times. He had a prior trial on the very same case and was represented by counsel at that time. Pretrial motions had been filed by counsel at his retrial. He indicated that he did not want Russman to represent him because Russman did not want to make Raymond's prior sexual contact conviction part of his defense and because Russman did not bring up on appeal all the issues Raymond thought he should. The reasons for wishing to proceed pro se were legitimate, even if Raymond's trial strategy may not have been the wisest course of action.

[¶ 15.] These additional circumstances, plus the *Van Sickle* warnings, convince us that

---

2. The ultimate purpose of the admonition is to establish "through an on-the-record interchange with the defendant that the defendant understands and appreciates the disadvantages and consequences of self-representation." *Van Sickle,* 411 N.W.2d at 668 (Miller, J., concurring specially). In the case now before us, the trial court painstakingly reviewed each *Van Sickle* factor with Raymond, thus avoiding any question as to whether Raymond somehow gained this knowledge through other sources.

3. Raymond's answers were framed in the following absolutes: "Correct." "Very much so." "Yes, I do." "I sure do." "Absolutely, beyond a shadow of a doubt." "Everything, Your Honor."

Raymond's waiver of counsel was knowing, intelligent, and voluntary. "[W]e must place some faith in the trial court's decision to allow defendant to proceed without counsel; inherent in such decision is the implication that the trial court was satisfied that defendant ... understood the hazards of self-representation." *State v. Miller*, 248 N.W.2d 61, 63 (S.D.1976).

[¶ 16.] On appeal, Raymond for the first time now contends that he was incompetent to waive counsel. We disagree. The trial court on its own motion ordered an evaluation of Raymond to determine if he were suffering from any mental disease or defect which would make him unable to understand the nature and the consequences of the proceedings against him or assist properly in his own defense.

■ [¶ 17.] The test for competency to waive counsel is the same as that for competency to stand trial as set forth in *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321, 330 (1993), that is: whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has a "rational as well as factual understanding of the proceedings against him" (adopting the standard in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Godinez*, 509 U.S. at 399, 113 S.Ct. at 2687, 125 L.Ed.2d at 332 (emphasis original).

[¶ 18.] In the instant case, the psychiatrist who examined Raymond, Dr. Pettit, was appointed by the court to determine Raymond's competency. Dr. Pettit conducted a mental status examination and reviewed previous treatment records, concluding that in his opinion, Raymond was competent to understand the nature and consequences of the proceedings against him and was able to conduct his own defense in a rational manner.

[¶ 19.] Raymond suggests that we apply a new standard for competency to waive counsel, one which would require the court to conduct a specific inquiry into whether an accused who seeks to waive counsel can proceed alone and uncounselled. This we will not do. We believe the *Godinez* rationale is sound:

> [We do not] think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights.

*Id.* at 399, 113 S.Ct. at 2686, 125 L.Ed.2d at 332.

■ [¶ 20.] Raymond next contends Dr. Pettit's conclusions were erroneous because Dr. Pettit had only been asked three or four prior times to determine an individual's competency to stand trial; had not administered any updated standardized tests; and failed to realize the import of the prior testing on Raymond. The record does not suggest Dr. Pettit's conclusions were in error.

[¶ 21.] Dr. Pettit testified that Raymond was not exhibiting any signs of depression or hallucinations; was able to relate the nature of the offense, the types of pleas available, and the consequences of acquittal and conviction; was coherent and rational, if a bit irritated, during the examination; was oriented; was not exhibiting any looseness of association; and, was generally of low average intelligence. There was nothing in the testimony to suggest that Raymond was not competent. In fact, Raymond had been examined by a different psychiatrist, Dr. Kirk Zimbelman, in 1992, prior to his first sexual contact offense and was determined at that time by Dr. Zimbelman to be competent to stand trial.

[¶ 22.] Further, the record shows that Raymond was able during his trial to understand the elements of the offense with which he was charged; indicated he would file an intermediate appeal with the Supreme Court when his request for a continuance was denied; correctly responded to an objection of compound question by breaking down his question for the witness; remembered prior answers of witnesses during cross and confronted them with those prior answers;

properly modified a jury instruction; requested that the court not instruct the jury on inferences from his decision not to testify; correctly used documents to refresh witnesses' memories; asked appropriate follow-up questions; and referred the jury to instructions during closing.

[¶ 23.] Raymond states that he rambled during motions hearings and opening and closing statements. The record shows this is true. It does not reflect on his competency to decide whether to defend himself; rather, it is representative of his competency as an attorney, which as we earlier stated, is not the test. *Id.* Raymond raises the legal concepts which might apply, but does not have the training to properly target them to his circumstances. He was much more adept at attempting to establish the factual issues in his case, which he did in the direct and cross-examination of witnesses. He became difficult to understand when he was examining his own expert witness on the stand—again throwing out complex psychiatric terms he did not understand, hoping the "shotgun" approach would hit the target somewhere. This is one of the potential landmines all pro se litigants may step into, and it was explained to Raymond by the trial court during the *Van Sickle* warnings.[4]

[¶ 24.] Raymond would have us make much of the fact that he admitted his prior conviction for sexual contact at least 23 times, stating this demonstrates he is incompetent. It actually shows the reverse. When he asked for permission to proceed pro se, Raymond stated that his attorney would not go along with admitting the prior conviction. Raymond wanted to argue his theory of the case: that he was innocent, but because of his prior conviction, he was singled out as a scapegoat by a paranoid and depressed relative, a previously abused child suffering from post-traumatic stress syndrome, and a system that had it in for him because of his prior conviction. The jury did not buy into this theory, but that does not mean it was not a valid approach.

[¶ 25.] Finally, Raymond argues that he did not unequivocally waive his right to counsel because at one point he told the trial court that there were no competent attorneys in Aberdeen and rather than be represented by one, he would proceed pro se. We have carefully studied the entire record and are convinced that Raymond unequivocally intended to waive his right to counsel and intended to represent himself during the balance of the proceedings.

[¶ 26.] We hold that Raymond was competent to waive counsel, and that his waiver was knowing, intelligent and voluntary.

[¶ 27.] **2. Whether the sentence of life imprisonment without parole is so grossly disproportionate to Raymond's crime that it constitutes cruel and unusual punishment.**

[¶ 28.] Raymond was sentenced to life in prison without possibility of parole. Since this was Raymond's second conviction on a sexual contact charge involving a child under age 10, the statutory minimum sentence is 10 years pursuant to SDCL 22-22-1.2.[5] The statutory maximum for a violation of SDCL 22-22-7, a Class 3 felony, is 15 years in prison. The trial court enhanced the conviction to a Class 1 felony under the habitual offender provisions of SDCL 22-7-8, since

---

4. Trial Court: Now, I want to inform you that criminal trials are governed by technical rules, and those rules apply whether an attorney participates or not. So in other words, the rules of evidence are the rules of evidence, and they apply to you if you're going to act as your own lawyer, as well as to any lawyer that would represent you. Do you understand?
Raymond: Very much so, Your Honor. Thank you.
Trial Court: So because you're not a lawyer, you can't come into that trial ... and say, well, Judge, I don't know what to do here now, and I don't know how to interrogate or cross-examine this witness, so I want you to do it for me, or I want somebody else to do it for me or give me some latitude. The Court can't permit that. Do you understand that?
Raymond: Yes, very much so.

5. SDCL 22-22-1.2 provides, in relevant part:
If any adult is convicted of any of the following violations, the court shall impose the following minimum sentences:
. . .
(2) For a violation of § 22-22-7 if the victim is less than ten years of age, five years for a first offense and ten years for a subsequent offense.

Raymond had prior felony convictions of third-degree burglary, first-degree burglary,[6] and sexual contact with a minor. Raymond contends that the sentence constitutes cruel and unusual punishment.

[¶ 29.] This Court has clearly established the standard we apply when reviewing whether a sentence is cruel and unusual. Our first inquiry is a two-part "shock-the-conscience" analysis.

> First, is the punishment so excessive or so cruel, 'as to meet the disapproval and condemnation of the conscience and reason of men generally.' And second, whether the punishment is so excessive or so cruel as to shock the collective conscience of this court.

*State v. Lemley,* 1996 SD 91, ¶ 10, 552 N.W.2d 409, 412 (citing *State v. Pulfrey,* 1996 SD 54, ¶ 7, 548 N.W.2d 34, 36). Whether we ever get to a proportionality analysis in a noncapital case is an open question which this Court need not answer for the disposition of this case. *State v. Peterson,* 1996 SD 140, ¶ 21 n. 5, 557 N.W.2d 389, 394 n. 5.

[¶ 30.] When we analyze whether a punishment "meets the disapproval and condemnation of the conscience and reason of men generally," we look to the Legislature for guidance. The Legislature, by setting the maximum sentence for specific crimes, reflects public intent. *Lemley,* 1996 SD 91, ¶ 11, 552 N.W.2d at 412.

[¶ 31.] The sentence in this case was within the prescribed statutory guidelines for a Class 1 felony. When reviewing a punishment within statutory limits, our inquiry is limited to whether the trial court abused its discretion. *Id.* ¶ 9, 552 N.W.2d at 411–12. It is settled law in this state that a sentence within the statutory limits is not reviewable on appeal unless it is so excessive in duration that it shocks the conscience of the court. *State v. Kaiser,* 526 N.W.2d 722, 726 (S.D. 1995).

[¶ 32.] Before sentencing a defendant, the trial court should examine the defendant's " 'general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.' " *State v. Chase in Winter,* 534 N.W.2d 350, 354–55 (S.D.1995) (quoting *State v. Pack,* 516 N.W.2d 665, 667–68 (S.D.1994) (citations omitted)). The trial court did so in this case. In considering the presentence investigation, the prior testimony at the first sentencing hearing, and testimony of Raymond and his mother at the second sentencing hearing, the trial court found that Raymond was arrested and convicted 28 separate times since 1975. Raymond had his first run-in with the law at age 15, and was 40 at the time of sentencing. Of his 28 convictions, 13 involved crimes of violence and seven involved death threats. Six involved theft by threat. Raymond was twice convicted for sexual contact with children under the age of 10. The girls were seven and eight years old at the time they were victimized, and both girls considered him part of their family. There was a violation not only of their bodies, but of their trust and the trust of their parents, who are related to Raymond.[7]

[¶ 33.] In recent years, the Legislature of this State has increased the penalty for sexual contact with a child under age 16. In 1992, it imposed a minimum penalty, increased the penalty if the victims were under age 10, and increased the minimum again for a subsequent offense. SDCL 22-22-1.2. In 1990, sexual contact with a child under age 16 was increased from a Class 4 felony to a Class 3 felony. SDCL 22-22-7. These legislative changes are a barometer of the public's increasing intolerance for sexual exploitation of children. Raymond has failed to prove that the sentence imposed by the trial court in this case, involving the repeated exploitation of young children by a trusted family member, would shock the public conscience.

---

6. First degree burglary is included in the definition of crimes of violence under SDCL 22-1-2(9). A crime of violence is required for enhancement under SDCL 22-7-8.

7. At the sentencing hearing, an 18–year–old relative of Raymond's testified that Raymond had forcibly raped her in December, 1993, three months after the incident which is the subject of this appeal. Another witness testified that Raymond had fondled her when she was 14 years old.

[¶ 34.] The trial court also considered Raymond's record of blatant disregard for authority. Police officers testified that Raymond became hostile and violent especially when drinking, and threatened them with death or bodily harm. The trial court pointed out Raymond was dishonorably discharged from the Marines after several unauthorized absences, including being absent without leave for 574 days. He also violated parole in 1989 and was returned to the penitentiary. Upon his release he again violated parole in 1990 and was returned to the penitentiary. On the very day of his next release, he perpetrated sexual abuse on one of the children. His most recent conviction was shortly after his release on the first sexual contact conviction. At both sentencing hearings in the instant case, he showed no remorse, and his statements to the court exhibited a tendency to blame others for his troubles with the law.

[¶ 35.] When the trial court imposes a sentence, it must keep in mind the commonly accepted goals of punishment, namely: 1) retribution; 2) deterrence, both individual and general; and 3) rehabilitation. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

> We have recognized that while a life sentence without parole extracts [sic] retribution, deters the convict from committing crime, removes him from the street, and puts would-be felons on notice of the high penalty of recidivism, it completely eschews the goal of rehabilitation.

*Bult v. Leapley*, 507 N.W.2d 325, 327 (S.D. 1993); *State v. Weiker*, 342 N.W.2d 7, 10 (S.D.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1422, 79 L.Ed.2d 747 (1984). We therefore have determined a trial court should only impose a life sentence when the facts of the principal offense and the previous convictions make rehabilitation so unlikely that it is removed from consideration in sentencing. *Peterson*, 1996 SD 140, ¶ 29, 557 N.W.2d at 395. In Raymond's case, the sentencing court found Raymond incapable of rehabilitation. In light of the record, we cannot say the trial court abused its discretion in that regard or in the sentence imposed.

[¶ 36.] When we consider Raymond's lengthy and violent criminal record, his history of disregard for authority, for the law and for the consequences to his victims, and when we note what appears to be an escalation in criminal sexual behavior, a life sentence without parole does not shock the collective conscience of this Court. We agree with the trial court that "[t]he interests of society demand that the defendant be kept off the streets for the rest of his life."

[¶ 37.] Because we do not find Raymond's life sentence without parole meets either prong of the threshold "shock the conscience test," it is not necessary for this Court to consider the issue of whether a proportionality review is required, *id.* at ¶ 21 n. 5, 557 N.W.2d at 394 n. 5, or address the evidentiary issue raised by the State in its notice of review.

[¶ 38.] We affirm the judgment of conviction and sentence of the trial court.

[¶ 39.] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.

