1997 SD 107

STATE of South Dakota, Plaintiff
and Appellee,

v.

Gene CHAMLEY, Defendant
and Appellant.

No. 19545.

Supreme Court of South Dakota.

Argued Feb. 18, 1997.

Decided Aug. 20, 1997.

608

Mark Barnett, Attorney General, Michele K. Bennett, Assistant Attorney General, Pierre, for plaintiff and appellee.

Mark E. Deboer, Office of the Public Defender, Rapid City, for defendant and appellant.

VONWALD, Circuit Judge.

[¶ 1.] Chamley appeals his conviction on one count of first degree rape, two counts of sexual contact with a child under sixteen and one count of indecent exposure. We reverse and remand for a new trial.

## FACTS

[¶ 2.] On September 1, 1995, K.J. and her eight-year-old daughter, W.W., planned to invite some of W.W.'s friends to spend the night at their home. The children who eventually spent the night were S.Y., who was nine years old at the time, and C.R., who was then ten years old. Another girl, N.G., was also present during the evening, but did not spend the night. That same evening, Chamley came over to visit. Chamley, who was a friend of K.J. and lived only a short distance away, was a frequent visitor and often played with the children.

[¶ 3.] At trial, W.W. and C.R. testified that while they were playing in the living room of K.J.'s home, Chamley exposed himself to them.[1] This conduct forms the basis of the indecent exposure charge. Later that evening, Chamley gave S.Y. and N.G. a "piggy back" ride from the house to a tent which was set up in the back yard. N.G. was on Chamley's shoulders and S.Y. was on his back. S.Y. testified that during the course of the piggy back ride, Chamley put his fingers beneath her underwear and inside her vagina.[2] This conduct forms the basis of the first degree rape charge.

[¶ 4.] After Chamley arrived at the tent, he put the girls down. Then Chamley, N.G., S.Y., C.R., W.W. and K.J. entered the tent. Some time later, N.G. left the tent and went home. During the time the group was in the tent, K.J. would frequently leave the tent to retrieve items for the group from the house. W.W. testified that while K.J. was in the house on one of these occasions, Chamley touched her on her chest and her private parts. She also stated that his fingers went under her clothing.[3] C.R. testified that on another of these occasions Chamley touched her chest, bottom and private area by putting his hand under her clothing.[4] These incidents form the basis for the sexual contact charges.

[¶ 5.] Chamley was found guilty on all four charges and was sentenced to life imprisonment on the rape charge, twenty-five years imprisonment on each count of sexual contact and one year imprisonment on the indecent exposure charge. All sentences were to be served concurrently. This appeal ensued. Chamley raises four issues on appeal.

## ISSUE 1

[¶ 6.] **Did the trial court abuse its discretion in admitting "prior bad acts" evidence involving Chamley's alleged sexual misconduct?**

[¶ 7] Prior to trial, state filed its notice of intent to use 404(b) evidence alleg-

---

1. C.R. testified that after Chamley exposed himself, she and W.W. ran to K.J., who was in the kitchen. Neither girl told K.J. of the incident, however. On cross-examination, C.R. admitted that she had previously stated that Chamley exposed himself not in the house, but in the tent and that the only thing she saw in the house was Chamley rubbing W.W.'s leg.

2. At the same time Chamley was giving N.G. and S.Y. a piggy back ride, C.R. gave W.W. a piggy back ride. K.J. followed behind the group. Despite their proximity to Chamley and S.Y., C.R., W.W. and K.J. did not witness Chamley engage in this conduct. Furthermore, S.Y. did not tell K.J. about this incident.

3. W.W. also stated that she observed Chamley kiss C.R. on the neck. C.R. testified that Chamley had not kissed her on the neck as W.W. had said. Additionally, in a previous statement, W.W. claimed to have observed S.Y. slap Chamley on the hand in response to him rubbing S.Y. on the leg while in the tent. S.Y. was impeached on cross-examination with an earlier statement wherein she admitted that Chamley had never touched her while in the tent. In addition, she never testified to having slapped Chamley.

4. C.R. was confronted on cross-examination by a previous statement to the police wherein she denied having been touched by Chamley.

ing sexual acts or encounters involving Chamley and his ex-stepdaughter, A.L., beginning when she was six and continuing until she was fourteen.[5] State offered the prior bad acts evidence to establish absence of mistake or accident and intent. The four instances of "prior bad acts" included: (1) an act in which Chamley is alleged to have masturbated in front of A.L. when she was six; (2) an act in which Chamley allegedly requested A.L. to pose nude for photographs when she was seven or eight; (3) an act in which Chamley allegedly had oral sexual contact and penetration upon A.L. when she was nine; and (4) an act in which Chamley touched A.L.'s breasts when she was fourteen. These four incidents took place from twelve to twenty years prior to the trial.[6] After a hearing on the matter, the trial court granted state's request to use the 404(b) evidence, stating that the probative value of the evidence substantially outweighed any prejudicial effect and that the evidence "establish[ed] a mirror image of the events charged in the present case." The decision to admit evidence at trial is a matter within the discretion of the trial court and is reviewed under an abuse of discretion standard. *State v. Fowler*, 1996 SD 78, ¶ 12, 552 N.W.2d 92, 94. Our test on review is not whether we would make a similar ruling, but rather whether a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion. *State v. Barber*, 1996 SD 96, ¶ 14, 552 N.W.2d 817, 820.

[¶ 8.] The trial court's decision to admit the prior bad acts is governed by SDCL 19–12–5 (Fed.R.Evid. 404(b)). SDCL 19–12–5 states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[¶ 9.] This statute establishes a general rule that evidence of crimes or acts, other than the ones with which a defendant is charged, is inadmissible. SDCL 19–12–5; *State v. Moeller*, 1996 SD 60, ¶ 12, 548 N.W.2d 465, 471 (S.D.1996); *In re R.S.S.*, 474 N.W.2d 743, 747 (S.D.1991). The reason for this rule is simple. There is a danger that the jury may use the prior bad acts to convict a defendant because they believe the defendant is a bad person. *Moeller*, 1996 SD 60 at ¶ 12, 548 N.W.2d at 471; *In re R.S.S.*, 474 N.W.2d at 747. The jury may also believe that because the defendant committed a similar offense on another occasion he has a propensity to commit the offense charged. *State v. Steele*, 510 N.W.2d 661, 668 n. 8 (S.D.1994). Because of these dangers, courts must carefully consider requests to use prior bad acts evidence and must remain "ever vigilant" so as to ensure that the general rule excluding prior bad acts evidence is not swallowed up by the exceptions. *Id.* at 667.

[¶ 10.] Before being admitted, prior bad acts evidence must pass a two-prong test: (1) the intended purpose for offering the other acts evidence must be relevant to some material issue in the case (*Barber*, 1996 SD 96 at ¶ 15, 552 N.W.2d at 820 (citations omitted)); and (2) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice. SDCL 19–12–3. The first inquiry concerns factual relevancy, whether the proffered evidence has any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence. SDCL 19–12–1 (Fed.R.Evid. 401). The second inquiry is addressed to legal relevancy, whether the probative value of the proffered evidence substantially outweighs the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time

---

**5.** A.L. was twenty-six years of age at the time of trial. Thus, even the most recent prior bad act was well over ten years old.

**6.** The record indicates that all four of the prior bad acts originally came to light at the same time. Because the statute of limitations on the first three had expired by the time the acts came to light, Chamley could not be prosecuted on those charges. Nevertheless, Chamley maintains that those acts never occurred. Chamley admitted to the fourth prior bad act, which resulted in a guilty plea.

or needless presentation of cumulative evidence. SDCL 19–12–3 (Fed.R.Evid. 403). In addition to considering this two-prong test, the trial court must also identify the specific exception under which the bad acts evidence is to be admitted. *Barber*, 1996 SD 96 at ¶ 15, 552 N.W.2d at 820. In the instant case, the trial court determined that the prior bad acts were relevant, ruled that the probative value of the prior bad acts evidence substantially outweighed the prejudicial effect of their admission and identified the specific exceptions under which the evidence was admitted.

### Analysis

[¶ 11.] One of the purposes for which state offered the prior bad acts was to establish lack of mistake or accident. Chamley, however, has denied that he committed any of the charged acts. His defense at trial was not based on a mistaken or accidental touching. Thus, there was no need for state to introduce the prior bad acts to prove lack of mistake or accident. State must show some connection between the reason they offer the prior bad acts and either their or the defendant's theory of the case.[7] *See, e.g., State v. Champagne*, 422 N.W.2d 840, 843 (S.D.1988) (when identity of the defendant is not in issue, other acts evidence is not admissible under the common plan, design or scheme exception to identify defendant as perpetrator; such evidence can only be misused to establish propensity). If the situation were otherwise, state would be able to admit prior bad acts for no relevant or probative purpose. The prior bad acts were improperly admitted to show lack of mistake or accident.

[¶ 12.] The only other purpose for which state was allowed to use the prior bad acts was to show intent. When considering whether admission of prior bad acts is probative of intent, trial courts should compare, among other factors, the similarity between the prior bad acts and the crimes with which the defendant is charged. *State v. Titus*, 426 N.W.2d 578, 579–80 (S.D.1988); *Moeller*, 1996 SD 60 at ¶ 28, 548 N.W.2d at 475 ("In allowing bad acts evidence to prove ... specific intent, our cases have routinely focused on two important factors: (1) similar victims and (2) similar crimes" (citations omitted)). A prior bad act not similar in some important respect to the charged conduct is unlikely to be probative of whether the defendant intended to commit the charged crime. *Moeller*, 1996 SD 60 at ¶ 16, 548 N.W.2d at 472. The trial court in this case made such a comparison and concluded that the prior bad acts were a "mirror image" of the present charges.

[¶ 13.] The instances of prior bad acts included: (1) an act in which Chamley is alleged to have masturbated in front of A.L. when she was six; (2) an act in which Chamley allegedly requested A.L. to pose nude for photographs when she was seven or eight; (3) an act in which Chamley allegedly had oral sexual contact and penetration upon A.L. when she was nine; and (4) an act in which Chamley touched A.L.'s breasts when she was fourteen. Testimony from A.L. elicited at trial indicated that the first act occurred when Chamley was at home with A.L. while her mother, Chamley's wife, was at work. A.L. testified that Chamley requested that she go to the bedroom with Chamley. When she did, Chamley disrobed and asked her to hold his penis. When A.L. refused, Chamley began to masturbate. She then left the room. The second act occurred when Chamley requested, on one occasion, to take photos of A.L. in the nude. A.L. refused to allow Chamley to photograph her. The third act occurred when A.L. was at home from school because she was ill. Chamley, who according to A.L. often walked around in the house naked, entered A.L.'s room. A.L. testified that Chamley removed her clothes, licked her vagina and then put his finger inside her vagina, moving it in and out. When Chamley stopped, he wiped A.L. with a washcloth and said, "Don't tell anyone or I will make it so that your mother does not love you." The fourth act occurred on anoth-

---

7. As we recently held in *State v. Ondricek*, 535 N.W.2d 872, 874 (S.D.1995), where specific intent is an element of an offense, proof of similar acts may be admitted so that state may carry its burden, even if the defense to the charge is a complete denial. *State v. Klein*, 444 N.W.2d 16, 19 (S.D.1989).

er occasion after Chamley entered A.L.'s room while she was sleeping. When A.L. awoke, she discovered that Chamley had his hand down the front of her blouse and underneath her bra.

[¶ 14.] A comparison of the prior bad acts with Chamley's alleged indecent exposure indicates minimal similarity. Comparing A.L.'s testimony with the rape charge produces a like result. Indeed, only one of the prior bad acts is even remotely similar to the rape charge. The third prior bad act involved digital penetration, as did the rape charge. A fact that cannot be overlooked about the third prior bad act, however, is that it also involved both oral sex and a threat. In the instant case, Chamley is not alleged to have performed or attempted to perform oral sex on any of the young girls and there is no allegation that he ever threatened any of the girls. These important differences substantially decrease the probative value of the prior bad acts evidence with respect to the rape charge. The lack of similarity between these events convinces us that the danger of unfair prejudice substantially outweighs the probative value of the prior bad acts evidence. SDCL 19–12–3.

[¶ 15.] Finally, there is no similarity between the first three prior bad acts and the sexual contact charges. Chamley did not ask either girl to hold his penis, he did not masturbate in front of the girls, he did not ask to photograph them in the nude, he did not engage in oral sex with either girl and he did not commit digital penetration upon either W.W. or C.R. There is similarity between the fourth prior bad act and the sexual contact charges. If this prior bad act was the only one admitted, we would have been presented with a much closer question. Suffice it to say that Chamley was prejudiced by the admission of the prior bad acts. *See, e.g., State v. Pedde,* 334 N.W.2d 41, 43 (S.D.1983) (evidence of prior acts need not be that of an identical offense but only of similar involvement reasonably related to the offending conduct). Given the lack of similarity between the prior bad acts and the charged conduct, it was error for the trial court to allow the jury to hear the prior bad acts evidence. There can be no doubt that the cumulative prejudicial effect of the prior bad acts substantially outweighs the probative value and permitted the jury to draw the forbidden propensity inference. The prior bad acts involved vile conduct of a highly emotional nature which can fairly be said to have had the effect of inciting the jury to convict Chamley solely on the basis of his prior unproven despicable conduct.[8]

[¶ 16.] When considering whether to admit prior bad acts to prove intent, courts must consider more than just the similarity between the prior bad acts and the charged conduct. Trial courts should also consider the age of the prior bad acts. *Titus,* 426 N.W.2d at 580. Just as a prior bad act with few similarities to the charged crime may not justify the prejudice of its admission, a prior bad act which took place a significant time in the past is unlikely to be probative of whether the defendant intended to commit the charged crime. All of the prior bad acts which were admitted in this case were old.[9] They occurred anywhere

---

8. The dissent suggests that the majority has abandoned the abuse of discretion standard of review in overturning the trial court's decision admitting the prior bad acts evidence. However this is not the first time we have determined over a comparable dissent that prior bad acts were improperly admitted under SDCL 19–12–5. In *Moeller,* 1996 SD 60, 548 N.W.2d 465, for example, we held it was an abuse of discretion to allow prior bad acts evidence to show common method, plan or scheme, intent, identity and motive, in part because of the lack of similarities between the other acts evidence and the alleged crime.

9. The fourth prior bad act state requested to introduce resulted in a guilty plea and conviction

over ten years prior to trial. The fact that Chamley was convicted, however, did not mean that state was confined to the strictures of SDCL 19–14–12 (Fed.R.Evid. 609(a)) and 19–14–13 (Fed. R.Evid. 609(b)) when using that evidence. SDCL 19–12–5 expressly allows courts to admit evidence of other *"crimes"* for the purposes enumerated in that statute. In other words, the prosecution is not limited to just presenting evidence that a defendant has been convicted of a crime if he takes the stand. The prosecution may also introduce testimony regarding the crime for any purpose within the ambit of SDCL 19–12–5 if it sustains its burden under the statute. Moreover, the prosecution may introduce this as circumstantial evidence in its case-in-chief. This is what state did in the instant case.

from twelve to twenty years prior to the trial date. Although SDCL 19–12–5 does not specifically refer to the age of the bad act as a factor in assessing admissibility, it is an important factor in determining whether the probative value of the act substantially outweighs the risk of unfair prejudice.[10] *State v. Christopherson*, 482 N.W.2d 298, 302 (S.D. 1992); *Titus*, 426 N.W.2d at 580. On the whole, the age of the prior bad acts and the lack of similarity significantly cuts into state's argument regarding their admissibility. Although state offered the prior bad acts to demonstrate absence of mistake or accident and intent, it is simply not justified by and clearly against reason, and thus was an abuse of discretion, to hold that the value of the prior bad acts in this case *substantially* outweighs the risk of unfair prejudice.

## ISSUE 2

**[¶ 17.] Did the trial court err in denying Chamley's motion to introduce the "McDonald's" evidence?**

### The "McDonald's" evidence

[¶ 18.] In an interview before trial, W.W. told Officer Kerry Hartnett that while she was at McDonald's having lunch during a school field trip on December 20, 1995, Chamley was staring at her and blowing kisses at her. W.W. also said that when she and her partner for the field trip, L.G., got up to use the restroom, Chamley was standing there blocking the door. W.W. stated that Chamley said "I love you W." and then touched her on the shoulder at that time. W.W. said that she then grabbed L.G.'s hand and that the two of them tried to ignore Chamley and walk past him. W.W. also stated that after she went back to her table, Chamley walked by the table a few times, sat down next to her, said "Hi, how are you doing?" or "How are you doing, W.?" and

reached over and touched her butt. At some point in time, S.Y. went up to tell their teacher, Ms. Pena, that Chamley was in McDonald's.

[¶ 19.] In another interview before trial, Ms. Pena told Officer Hartnett that S.Y. did talk to her about Chamley's presence in McDonald's. Ms. Pena had no idea who Chamley was at the time, but asked S.Y. where Chamley was. When S.Y. pointed Chamley out, Ms. Pena observed Chamley sitting on the opposite side of the restaurant from W.W. She did not see anyone sitting with Chamley when she looked over. Ms. Pena further stated that W.W. was sitting in an area on nearly the opposite side of the restaurant such that W.W. would not have been able to observe Chamley. When Ms. Pena looked over to where W.W. was sitting, Chamley was not sitting by W.W. Ms. Pena also said that while she was still talking to S.Y., she saw Chamley throw away a cup of coffee and walk out the restaurant door on the opposite side of where W.W. was sitting.

[¶ 20.] L.G. stated that while she and W.W. were eating at McDonald's, W.W. told her, "There's that guy." L.G. said that she was with W.W. virtually the entire time at McDonald's and that she never observed Chamley sitting by W.W. L.G. also stated that she and W.W. went to the bathroom together and that no one approached them, no one said, "I love you, W." and no one blocked their way to the bathroom. Finally, L.G. said that she never saw Chamley wave or blow kisses at either her or W.W.

[¶ 21.] At trial, Chamley attempted to cross-examine W.W. regarding the McDonald's incident and introduce the testimony of Ms. Pena and L.G. in an effort to impeach W.W. The trial court refused to allow Chamley to do either. Chamley's theo-

---

10. Age of prior convictions is of central importance when ruling on admissibility under SDCL 19–14–12. In fact, under SDCL 19–14–13 (Fed. R.Evid. 609(b)), it is so important that if the prosecution wishes to introduce evidence of a conviction more than ten years old, it must notify the defense in writing of its intention to use such evidence and prove "that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Although we have chosen not to

set a specific time limitation when determining whether bad acts are too remote, *Ondricek*, 535 N.W.2d at 877, we can discern no reason why age of a prior bad act should warrant any less scrutiny, especially in light of the fact that a prior bad act concerns alleged conduct which someone believes may have occurred, whereas a prior conviction involves conduct which has been proven beyond a reasonable doubt to have occurred.

ry was that W.W. lied about the McDonald's incident and that she, S.Y. and C.R. lied about their allegations of sexual misconduct.[11] In addition to the testimony of Ms. Pena and L.G., which clearly indicated that there were inconsistencies in the testimony of W.W., S.Y. and C.R., other testimony elicited at trial indicated that W.W., S.Y. and C.R. decided to get together and tell K.J. something about Chamley. They decided to do this after K.J. questioned W.W. and N.G. regarding whether Chamley had ever touched them or done anything strange to them.[12] Thus, Chamley's theory of the case finds support in the record.

### Analysis

[¶ 22.] The question raised by this issue is whether the trial court erred in denying Chamley's request to cross-examine W.W. regarding her "McDonald's" testimony and to introduce the testimony of Ms. Pena and L.G. in an effort to demonstrate that W.W. fabricated the McDonald's accusations. Like the first issue, the trial court's decision here is reviewed under an abuse of discretion standard. *State v. Fowler*, 1996 SD 78 at ¶ 12, 552 N.W.2d at 94.

[¶ 23.] The trial court refused to allow the prosecution to introduce W.W.'s testimony regarding the McDonald's evidence, stating that it constituted improper character evidence. The court left it up to defense counsel whether it could be used to impeach W.W.'s credibility if that issue came up. When the defense did request that W.W.'s McDonald's testimony be admitted at trial, the court refused to allow its admission, stating that it could be prejudicial to the defendant and that it was not probative of W.W.'s credibility.[13] We hold that the trial court improperly denied the defense request to cross-examine W.W. regarding her McDonald's testimony.

[¶ 24.] The testimony of W.W., Ms. Pena and L.G. concerning the McDonald's incident was relevant because it went to the important issue of credibility. If the jury believed the testimony of Ms. Pena and L.G., and thus concluded that W.W. was being untruthful about the McDonald's incident, then the jury might also have believed that if W.W. lied about the McDonald's incident, she may also have lied about the allegations of sexual misconduct against Chamley. In short, the McDonald's evidence supported Chamley's theory that W.W. fabricated the allegations of sexual misconduct.

[¶ 25.] In many sex crime cases, credibility of the witnesses is of paramount importance. In fact, it may well be the most important factor the trier of fact considers because there is often no direct evidence implicating the defendant. Moreover, allegations of sexual misconduct are easy to allege and difficult to disprove. When this is the case, the jury's decision to convict or acquit comes down to one person's word against another's. The victor of this credibility duel wins more than just vindication; the prize is a favorable verdict.

[¶ 26.] The trial court engaged in faulty analysis when it concluded that the McDonald's testimony should have been excluded because it could have been prejudicial to Chamley. The fact that the testimony may have been prejudicial to Chamley, who was the proponent of the evidence, if the jury did not believe the version his witnesses offered, was not a proper reason to exclude the testimony. Parties are free to introduce evidence which may, if not believed, be harmful to their case. That is a tactical decision the likes of which must often be made in criminal trials.

---

11. In addition to impeaching W.W., the "McDonald's" testimony also went to impeach S.Y.'s testimony since S.Y. said that Ms. Pena told her to move to a different table after she pointed out Chamley. S.Y. said that Chamley nevertheless continued to stare and smile at her. Ms. Pena testified that she did not have S.Y. move after Chamley left. Ms. Pena also testified that S.Y. stated, "I don't have to move now" after Chamley left.

12. K.J. was asked by either the Box Elder Chief of Police or a Box Elder police officer at the Police Chief's request to question W.W. because of Chamley's criminal record and the fact that Chamley was a convicted sex offender. When she was questioned by K.J., W.W. stated that she had not been touched by Chamley.

13. The defense then appropriately made an offer of proof regarding the testimony.

[¶ 27.] The fact that the trial court refused to admit the McDonald's evidence means that W.W.'s credibility was not, in the trial court's view, sufficiently diminished by the testimony of Ms. Pena and L.G. to warrant its admission. In *State v. Sieler*, 397 N.W.2d 89, 92 (S.D.1986), this Court held that before the credibility of an alleged victim of sexual contact could be impeached with prior sex crime accusations, the defense had to prove that the prior accusations were demonstrably false. That same standard applies in this case. The fact that the allegation was subsequent and not prior, and the fact that the allegation is against the same individual and not another, are not enough to distinguish this situation from that in *Sieler*.

[¶ 28.] There can be no doubt that the testimony of W.W. and S.Y. was directly contradicted by defense testimony from Ms. Pena and L.G.[14] While the trial court did not specifically rule on whether W.W.'s McDonald's accusation was demonstrably false, which it should have done, the ruling denying the defense request to introduce the McDonald's testimony had the effect of a ruling that this standard had not been met. Based on our examination of the record, we hold that it was error for the trial court to refuse to allow the defense to cross-examine W.W. regarding her McDonald's testimony. The defense met its burden of proving the McDonald's testimony demonstrably false and should have been allowed to question W.W. regarding the McDonald's allegations.

[¶ 29.] If, on retrial, W.W. denies having fabricated the McDonald's accusation, the defense may introduce extrinsic evidence in the form of testimony from Ms. Pena and L.G. in an effort to impeach W.W.'s credibility. *See Clinebell v. Commonwealth*, 235 Va. 319, 368 S.E.2d 263, 265–66 (1988) (providing citations and noting that a majority of jurisdictions hold that evidence of prior false accusations is admissible to impeach the complaining witness' credibility or as substantive evidence tending to prove that the instant offense did not occur); *see also State ex rel. Mazurek v. District Court of Fourth Judicial District*, 277 Mont. 349, 922 P.2d 474, 480 (1996); *Miller v. State*, 105 Nev. 497, 779 P.2d 87, 89 (1989); *State v. Barber*, 13 Kan. App.2d 224, 766 P.2d 1288, 1290 (1989). We realize that it is generally true that extrinsic evidence cannot be used to impeach a witness. In *State v. Byrum*, 399 N.W.2d 334, 337–38 (S.D.1987), however, we recognized the doctrine of impeachment by contradiction and, based on SDCL 19–14–8 (Fed.R.Evid. 607), allowed the introduction of extrinsic evidence to impeach the credibility of a witness.[15] That same narrow exception finds appropriate application in this case.

[¶ 30.] Additionally, the common law doctrine against impeachment by collateral facts does not prevent impeachment here. First, as a preliminary matter, it is noteworthy that whether or not the "McDonald's" testimony is considered collateral is determined by the prosecution. It could certainly have chosen to prosecute Chamley for the McDonald's incident (i.e., the sexual contact when Chamley touched W.W.'s "butt"). If the prosecution would have charged Chamley, the defense would then have been allowed to present the testimony of Ms. Pena and L.G. to refute W.W.'s version of the events. Second, while the inconsistencies the defense sought to demonstrate may, in the most narrow interpretation of the word, be collateral to the issue of whether or not

---

14. The testimony of Ms. Pena was taken at a bond hearing in which state attempted to have Chamley's bond revoked as a result of W.W.'s allegations. Chamley's bond was not revoked after the bond hearing. Whether this was due to the inconsistencies contained in the "McDonald's" evidence or from the trial court's concern that the bond conditions were not fully explained to Chamley is unclear from the record. L.G.'s testimony was taken in an offer of proof at trial.

15. SDCL 19–14–8 states: "The credibility of a witness may be attacked by any party, including the party calling him." The issue of credibility is a matter which may be inquired into on cross examination. SDCL 19–14–19 ("Cross-examination should be limited to . . . matters affecting the credibility of witnesses"). Credibility is defined as "that quality in a witness which renders his evidence worthy of belief." Black's Law Dictionary 366 (6th ed.1990). Some courts have also based a defendant's right to bring forward evidence of prior false accusations of sexual abuse in the confrontation clause. *See, e.g., Barber*, 766 P.2d at 1289.

Chamley is guilty of the crimes with which he is charged, they can hardly be considered collateral under a more practical definition because of the importance of witness credibility in a case with little or no direct evidence. This is especially the case since, if believed, Chamley's version has the potential to completely undermine W.W.'s credibility in the eyes of the jury.[16]

## ISSUE 3

[¶ 31.] **Was Chamley denied his Sixth Amendment right to self-representation?**

[¶ 32.] Early in the proceedings, Chamley made statements indicating he did not desire court appointed counsel and wished to represent himself. In fact, Chamley represented himself at a bond hearing held on September 8, 1995, making objections and conducting a cross-examination of the state's witness, even though an attorney from the public defender's office sat next to him. At one point during that hearing, Chamley even stated, "She's not my counsel and don't you say she is my counsel...."

[¶ 33.] At a preliminary hearing held on September 28, 1995, the assistant public defender stated that she believed Chamley wanted to represent himself. Early in that hearing, Chamley demanded that the assistant public defender withdraw from the case and not represent him. The magistrate judge, however, did not address this problem. Rather, the judge stated that because of the nature of the charges, he was going to allow the assistant public defender to represent Chamley for purposes of the hearing. At that point, the following discussion took place:

> Public Defender: Your Honor, if I could. When he initially made his initial appearance, he made it very clear he wanted to go pro se. In the interim, I have indicated to you that he wanted me to represent him. There has never been a record made of him saying he wanted that done. Today, for my purposes of—I need a more adequate record of whether or not he is desiring to go pro se or if he's desiring to

go with counsel. I need a more adequate record.

> The Court: I think what he's saying today is that he—he doesn't want you as his attorney right now, is that correct, for purposes of this hearing?

> The Defendant: I think that would be fair—pretty clear, Your Honor. That would be a very good statement.

> The Court: All right. I understand that, but I'm not going to let you get out of the case. I'm going to have you proceed, counsel.

> Public Defender: Well, Your Honor, I guess, this is—on that basis, it's clear that he does not want to be represented by counsel. I don't feel that I can infringe upon his right. He has every right case after case as to represent himself and go pro se, and I do not feel that I can represent him. If he says he—says he does not want to be represented by me, then I cannot be forced upon him.

> The Court: All right. Counsel, you've been appointed by this Court to represent Mr. Chamley. Are you telling me you're not going to do that?

> Public Defender: I'm not going to be asking any questions if—if Mr. Chamley does not want me to ask any questions.

> The Court: What I'm going to do is, before you ask questions, I'm going to give you additional time to consult if you need to take a break before cross-examination to consult. That way, the right to confrontation and—all the questions Mr. Chamley wants will be asked if they are—if they're wanted to be asked. All right.

When the time for cross-examination came, the public defender refused to ask any questions and again stated that Chamley had the right to proceed pro se.

[¶ 34.] Later, at Chamley's arraignment, the trial court stated:

> As far as I'm concerned, you're entitled to represent yourself. You have a right to do that as a pro se litigant. Based on the fact

---

16. As McCormick has stated, "to prove untrue some fact recited by the witness that if he were really there and saw what he claims to have seen, he could not have been mistaken about, is a convincing kind of impeachment that the courts must make place for.... To disprove such a fact is to pull the linchpin of the story." C. McCormick, *Evidence* § 47, at 111–12 (3d ed. 1984).

that you've previously been an attorney who has not practiced for many years, your questions today, your statement that you haven't read the statute as it related to one of the offenses, your general situation as it relates to procedure, failing to timely notify the State of any motions you want to present and have heard, which you're entitled to do, sir, but it has to be done pursuant to notice of statute—I think is a very, very serious case which has severe adverse consequences to you facing up to life imprisonment.

For those reasons and given the past records, Ms. Thomas, you're still, as far as I'm concerned, involved in this case as legal counsel for Mr. Chamley....

At the end of the arraignment, Chamley stated:

At this point I demand this counsel be dismissed. I demand I represent myself in every regard.... I don't need them to be present when I appear before the Court. They don't need to represent me. They haven't yet. It appears to me that all that's going to be is a delay in that regard. So what I'm saying to the Court now is that don't consider them as my attorney. They are not my attorney. They never have been my attorney. They have never represented me. I never asked them to represent me.

### Analysis

[¶ 35.] This is not the first time, nor will it be the last, that a defendant has demanded that he represent himself in a South Dakota courtroom. We have previously had the opportunity to explain that criminal defendants have a constitutional right to be represented by counsel and a constitutional right to represent themselves in court. *State v. Van Sickle*, 411 N.W.2d 665, 666 (S.D.1987) (citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). We have also stated that before an individual will be allowed to represent himself, the trial court must be satisfied that the individual has made a knowing, voluntary and intelligent waiver of his right to counsel. *Id.* Furthermore, a defendant's request to

represent himself must be unequivocal in nature. *Id.*

[¶ 36.] To ensure that the decision to proceed pro se is made knowingly and intelligently, the trial court must advise the defendant of the difficulties involved with self-representation. In *Van Sickle*, we noted that the following matters are important for the defendant's consideration: (1) that "presenting a defense is not a simple matter of telling one's story," but requires adherence to various "technical rules" governing the conduct of a trial; (2) that a lawyer has substantial experience and training in trial procedure and that the prosecution will be represented by an experienced attorney; (3) that a person unfamiliar with legal procedures may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, may not make effective use of such rights as the voir dire of jurors, and may make tactical decisions that produce unintended consequences; (4) that a defendant proceeding pro se will not be allowed to complain on appeal about the competency of his representation; and (5) that the effectiveness of his defense may well be diminished by his dual role as attorney and accused. *Id.* at 666–67 (citing R. LaFave, *Criminal Procedure*, § 11.5 (1984)). It is also important to note that so long as the defendant is competent to waive his right to counsel, the trial court need not concern itself with the defendant's ability to represent himself. *Godinez v. Moran*, 509 U.S. 389, 399–400, 113 S.Ct. 2680, 2686–2687, 125 L.Ed.2d 321, 332–333 (1993) (citing *Faretta*, 422 U.S. at 834–36, 95 S.Ct. at 2540–41).

[¶ 37.] In the instant case, Chamley was adamant in his desire to proceed pro se. The magistrate court and the trial court recognized this and, despite a clear understanding that Chamley wished to proceed pro se, forced Chamley to accept representation by an attorney he did not wish to have. Unlike the situation in *State v. Irvine*, 1996 SD 43, 547 N.W.2d 177 (1996), where the defendant made his request to proceed pro se the day before trial, Chamley made his request known to the court early in the proceedings. Thus, it cannot be said that Chamley's request to represent himself was interposed for

the purpose of disrupting or delaying the trial. *Id.* at ¶ 18, 547 N.W.2d at 182 (citing *Hamilton v. Groose*, 28 F.3d 859, 861–62 (8th Cir.1994)) (a defendant's request to represent himself may be denied where it is calculated to disrupt or delay the judicial process).

[¶ 38.] A review of the record reveals that Chamley was difficult to deal with at times.[17] He did, however, unequivocally demand to represent himself. By doing so, Chamley asserted a constitutional right which the trial court was not free to deny.[18]

[¶ 39.] The true error with respect to this issue is not that the pitfalls of self-representation were not explained to Chamley. Rather, it is that an attorney was forced upon Chamley when he desired to represent himself. As we noted in *Van Sickle*, it is not necessarily reversible error to fail to explain the pitfalls of self-representation to a defendant when the circumstances indicate the defendant understood the hazards of self-representation. 411 N.W.2d at 667. Here, it is likely that Chamley was cognizant of these hazards. He had been a licensed attorney and has had experience with the criminal justice system above and beyond the representation of clients. *See, e.g., Matter of Chamley*, 349 N.W.2d 56 (S.D.1984). If fact, Chamley was at the center of another South Dakota Supreme Court case in which the failure of a trial court to explain the pitfalls of self-representation was an issue. *See State v. Chamley*, 310 N.W.2d 153 (S.D.1981). In this case, the court should have followed up Chamley's request with an explanation of the pitfalls of self-representation and then determined whether, in light of that information, Chamley still desired to represent himself. If Chamley persisted in his desire to represent himself, he should have been allowed to do so.

[¶ 40.] On remand, Chamley will have the opportunity to resist the charges leveled against him. In the event Chamley chooses to represent himself, also on trial will be the truth of the proverb "He that is his own lawyer has a fool for a client." If this is what he so desires, however, Chamley has a constitutional right to proceed pro se, even if the consequences of his choice prove to be deleterious to his case. As the Supreme Court aptly stated in *Faretta*, it is the defendant who will bear the consequences of a conviction in such a case. 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562. This is, after all, why the pitfalls of self-representation must be explained to an individual intent on self-representation.

## ISSUE 4

[¶ 41.]    **Should Chamley have been allowed to recuse Judge Davis?**

[¶ 42.] The fourth issue Chamley has presented for review is whether he should have been allowed to recuse Judge Davis. SDCL 15–12–21 allows a party to file an affidavit for a change of judge. Nevertheless, SDCL 15–12–24 states, in pertinent part, that "[t]he submission to a judge or magistrate of argument or proof in support of a motion ... is a waiver of the right thereafter to file an affidavit for change of judge...." Prior to seeking Judge Davis' recusal, Chamley submitted motions and attempted to argue the merits of those motions to Judge Davis. This constitutes waiver of Chamley's right to seek recusal. Thus, Chamley was precluded from recusing Judge Davis.

[¶ 43.] The judgment of the trial court is reversed and we remand for a new

trial.

---

17. The trial court may have been concerned that Chamley would engage in disruptive behavior at trial. We agree that this may be a concern in some cases, but note that trial courts are afforded broad discretion in dealing with such matters when they come up during trial. *See State v. Weatherford*, 416 N.W.2d 47 (S.D.1987); *State v. Means*, 268 N.W.2d 802 (S.D.1978).

18. The denial of Chamley's assertion of his Sixth Amendment right to self-representation is not subject to prejudicial error analysis. To hold

otherwise would do little to protect a defendant's constitutional right to self-representation since it would rarely be prejudicial to appoint a licensed attorney to represent a defendant. This is in accord with decisions in other states. *See, e.g., State v. DuPaul*, 527 N.W.2d 238 (N.D.1995); *Van Riper v. State*, 882 P.2d 230 (Wyo.1994); *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995); *Young v. State*, 98 Nev. 467, 653 P.2d 153 (1982).

[¶ 44.] SABERS and AMUNDSON, JJ., concur.

[¶ 45.] GILBERTSON, J., and STEELE, C.J., dissent in part and concur in part.

[¶ 46.] VONWALD, Circuit Judge, for MILLER, C.J., disqualified.

[¶ 47.] STEELE, Circuit Judge, for KONENKAMP, J., disqualified.

GILBERTSON, Justice (dissenting in part and concurring in part).

[¶ 48.] I respectfully dissent from the majority on issues 1 through 3, and concur on issue 4. I would uphold Chamley's conviction.

[¶ 49.] **1. Did the trial court abuse its discretion in admitting "prior bad acts" evidence involving Chamley's alleged sexual misconduct.**

[¶ 50.] In order to find that a trial court has abused its discretion, we must find that the trial court's decision "is not justified by, and clearly against, reason and evidence." *Dakota Cheese v. Taylor*, 525 N.W.2d 713, 715 (S.D.1995). Because we cannot substitute our reasoning for the trial court's, "the question is not whether, had we been the trial judge, we would have admitted the prior bad acts evidence but whether the trial court sitting in this case abused its discretion by doing so." *State v. Moeller*, 1996 SD 60, ¶ 141, 548 N.W.2d 465, 496 (Gilbertson, J., concurring in part and dissenting in part).

[¶ 51.] It appears the majority has abandoned this most deferential standard of review for a de novo review of the trial court's evidentiary decision. *See* Martha S. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D.Law Rev. 468, 480 (1988) ("[Abuse of discretion] is the most deferential standard of review available with the exception of no review at all.") While the majority properly states the standard in *Barber, supra*, it fails to articulate how "a judicial mind, in view of the law and circumstances, could [not] have reasonably reached the same conclusion" as this trial court. *Barber*, 1996 SD 96 at ¶ 14, 552 N.W.2d at 820.

[¶ 52.] In the instant case, the trial court conducted a 404(b) hearing wherein Chamley's stepdaughter testified and was cross-examined as to the sexual abuse Chamley perpetrated upon her. Afterward, the trial court properly reviewed the 404(b) request by: 1) making a determination as to the relevance of the bad acts evidence to a material issue in the case; 2) identifying the specific exceptions, namely intent and absence of mistake or accident; and, (3) weighing the probative value of the evidence against its prejudicial effect.

[¶ 53.] The majority's analysis attempts to draw a line between the intent and absence of mistake or accident exceptions to 404(b), and the majority applies a different test to each one. However, in the context of this case, it is a distinction without a difference: whether Chamley touched the girls by mistake or by accident [19] is, in effect, whether he touched them without intent for sexual gratification. Thus, both exceptions should be analyzed under the intent exception.

*Relevance*

[¶ 54.] "Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant." SDCL 19–12–1; *State v. McDonald*, 421 N.W.2d 492, 494 (S.D.1988). One fact that is of consequence to the determination of any action for child sexual contact is the perpetrator's intent. *State v. Champagne*, 422 N.W.2d 840, 843 (S.D.1988). The State must prove beyond a reasonable doubt that the perpetrator's intent was to "arouse or produce sexual gratification" in himself or his victims. *Id.*; *see also, Thibodeau v. State*, 298 N.W.2d 818, 819 (S.D.1980) (State must prove every element of a charged offense beyond a reasonable doubt).

[¶ 55.] In its findings of fact and conclusions of law, the trial court determined that the 404(b) evidence was relevant to the material issue of Chamley's intent. This Court has previously held that prior bad acts are relevant for the purpose of showing intent, when some of the sexual touching allegedly occurred.

---

19. At trial, Chamley admitted that he gave the girls rides on his back and shoulders, which is

even when, as here, the defendant has denied the sexual contact ever occurred. *State v. Ondricek,* 535 N.W.2d 872 (S.D.1995); *State v. Christopherson,* 482 N.W.2d 298, 302 (S.D. 1992); *State v. Basker,* 468 N.W.2d 413, 416 (S.D.1991); *State v. Klein,* 444 N.W.2d 16, 19 (S.D.1989); *Champagne,* 422 N.W.2d at 843; *State v. Means,* 363 N.W.2d 565, 568 (S.D. 1985); *cf. State v. White,* 538 N.W.2d 237 (S.D.1995) (similarities of subsequent rape of another woman by defendant buttressed essential issue of consent in forcible rape/murder); *State v. McGill,* 536 N.W.2d 89 (S.D. 1995) (defendant's prior acts were relevant as course of conduct, an element of stalking charge). The trial court did not abuse its discretion in finding the prior bad acts were relevant to the issue of intent.

*Probative balancing*

[¶ 56.] After making its finding of relevance, the trial court next determined whether the "danger of unfair prejudice substantially outweighs the probative value of the evidence in view of the availability of other means of proof and the other factors under SDCL 19–12–3 (Rule 403)." *White,* 538 N.W.2d at 243 (internal citations and quotations omitted). "Prejudice does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Iron Shell,* 336 N.W.2d 372, 375 (S.D.1983) (quoting 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5215 at 274–75 (1978)).

[¶ 57.] The majority's finding that the trial court abused its discretion in admitting the other acts evidence is fundamentally flawed. SDCL 19–12–3 provides:

> Although relevant, evidence *may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,* confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphasis added.)

In other words, stating the law conversely, in deciding to ADMIT the evidence, the judge must find that the probative value is NOT substantially outweighed by the danger of unfair prejudice. The majority misstates the test as: "in assessing admissibility, it is an important factor in determining whether the *probative value ... substantially outweighs* the risk of unfair prejudice." By the plain language of SDCL 19–12–3, if the weight of the prejudicial effect and the probative value are the same, the evidence comes in. The probative value *never* has to outweigh the prejudicial effect for the evidence to come in. *See* J. Larson, *South Dakota Evidence,* § 403.1 (1991) ("The party objecting to the admission of evidence has the burden of establishing that the trial concerns expressed in the rule [SDCL 19–12–3, i.e., danger of unfair prejudice, confusion of the issues, or misleading the jury, or undue delay, waste of time, or cumulative evidence] substantially outweigh the probative value.") By the terms of the statute, in order to keep the evidence out, the danger of unfair prejudice must not only outweigh the probative value, but *substantially* outweigh it. *Lykken v. Class,* 1997 SD 29, 561 N.W.2d 302 (S.D. 1997); *State v. Rhines,* 1996 SD 55, 548 N.W.2d 415 (S.D. 1996); *White,* 538 N.W.2d 237; *Baker Livestock Exchange, Inc. v. Thompson,* 520 N.W.2d 263 (S.D. 1994). The majority improperly weighted the probative/prejudicial analysis.

[¶ 58.] One of the factors in the balancing of probative versus prejudicial is remoteness. The majority claims the 404(b) evidence against Chamley is too remote in time. Nonetheless,

> [r]emoteness must be considered with other factors, such as reliability and necessity, in determining probative value. The trial court must consider the nature of the offenses, the similarity of occasions and locations as well as the time elapsed between incidents.

*State v. Titus,* 426 N.W.2d 578, 580 (S.D. 1988).

[¶ 59.] This Court in *Ondricek* noted that sexual abuse cases are, by their very nature, characterized by larger gaps in time between incidents because the abuser may have to set up his opportunities to victimize children, and because it is likely that there are interim

incidents perpetrated on children who were too frightened or ashamed to report.[20] 535 N.W.2d at 877. In *Ondricek,* prior bad acts 20 years prior were deemed not too remote. *Id. See also State v. Werner,* 482 N.W.2d 286, 289–90 (S.D.1992) (where charged sexual contact occurred from October 1987 to March 1990, testimony indicating prior sexual contact from 1962 to 1990 not too remote); *Christopherson,* 482 N.W.2d at 302 (testimony regarding molestation which occurred up to seventeen years before trial not too remote). To overturn Chamley's conviction on such a basis as is advanced by the majority requires the overruling of the long accepted rule to the contrary as set forth in the above case law.[21]

[¶ 60.] In this instance, Chamley was sentenced to four years in the state penitentiary for his prior conviction.[22] Any period of incarceration or court supervision for parole or probation may also affect the time between reported incidents. *Moeller,* 548 N.W.2d at 505 (Gilbertson, J., dissenting in part and concurring in part)[23] (citing *State v.*

*Breazeale,* 238 Kan. 714, 714 P.2d 1356 (1986)), *cert. denied,* 479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 102 (1986) (ten years' time not found to be remote in light of fact defendant spent intervening years in prison); *State v. Martin,* 118 Idaho 334, 796 P.2d 1007, 1014 (1990) (period of ten and twelve years not found to be remote where defendant was incarcerated nearly the entire period). The reason for this rationale is obvious: it is difficult to molest children while incarcerated in prison. In holding that the trial court abused its discretion in admitting the prior acts in large part on the issue of remoteness, the majority is unable to come forth with a single case from this jurisdiction which adopts this rationale. All reported cases cited above are to the contrary.

[¶ 61.] The rationale of the majority also fails to give any consideration to the nature of the crime and its perpetrator. Contrary to our case law, *see Titus, supra,* at p. 613, it simply lumps all crimes together and arrives at the totally unsupported conclusion that, "a prior bad act which took place a significant

20. We would do well to heed the words of Justice Konenkamp cited in *Stratmeyer v. Stratmeyer,* 567 N.W.2d 220, 222–23 (S.D.1997) (conference):

Imagine being pricked on the arm with a pin. At first, such an intrusion would be disturbing, but with time might seem uneventful. Now imagine the pin carried a dreaded affliction, only discoverable after years of incubation. Such is often the nature of childhood sexual abuse. Many children only realize years later the true significance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals. For some children, sexual violation is so traumatic it becomes psychologically self-concealing, if only to preserve sanity.

21. The majority errs when it attempts to re-write the text of SDCL 19–12–5 (Fed.R.Evid. 404(b)) by adopting a ten-year consideration that is found in SDCL 19–14–13(Fed.R.Evid. 609(b)) but was specifically not included in the text of SDCL 19–12–5. The majority's premise that:

we can discern no reason why age of a prior bad act should warrant any less scrutiny [under SDCL 19–12–5] especially in light of the fact that a prior bad act concerns alleged conduct which someone believes may have occurred, whereas a prior conviction [under SDCL 19–14–12 & 13] involves conduct which has been proven beyond a reasonable doubt to have occurred. *Supra* at n. 5.

The majority misses the point of statutory construction. The evidentiary rules mean what they say and say what they mean. In addition such an approach as is now advocated by the majority is inconsistent with all of our previous case law in this area, such as *Ondricek, Werner* and *Christopherson, supra.*

If this were to come to pass, it would render the use of 404(b) evidence more ineffectual for purposes of prosecution of sexual offenders of children. Under SDCL 22–22–1.2, the minimum sentence for a rape of a child under age ten is ten years. The sentence for a second offense of sexual contact is also a minimum of ten years. *Id.* SDCL 22–22–30.1 sets a minimum sentence for criminal pedophilia at 25 years. Thus, under the rationale adopted by the majority, the more egregious the act, the greater protection from 404(b) application in subsequent prosecutions of sex offenders.

22. Chamley had received a suspended sentence, but violated the terms of his release and was returned to the penitentiary to serve out the rest of his sentence.

23. In *Moeller,* the Defendant challenged the admissibility of two prior sexual attacks which occurred in 1973 and 1979. While the majority determined that the prior acts were not properly admissible due to lack of probative value and the prejudice involved, the majority did not base its holding on any favorable determination of Moeller's remoteness claim.

time in the past is unlikely to be probative of whether the defendant intended to commit the charged crime." Such may possibly be said of a 20 year-old burglary. That perpetrator subsequently has the rational voluntary choice as to whether to repeat his criminal acts or abstain. A review of our reported cases shows that crimes of passion which result in homicides also carry low recidivism rates.

[¶ 62.] The same cannot be said of the compulsive behavior of perpetrators of child sexual abuse. The majority ignores the teachings of *People in the Interest of J.J.*, 454 N.W.2d 317, 325 n. 7 (S.D.1990) wherein the *J.J.* Court concluded, "[i]n fact, several studies suggest that child molesters such as G. and B.C. are not curable and have a high recidivism rates [sic]."(citations omitted). *See also Kansas v. Hendricks*, —— U.S. ——, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) [24]; *State v. Cragoe*, 514 N.W.2d 396, 398 (S.D. 1994) ("defendant is a pedophile whose prognosis for rehabilitation is poor to guarded at best"); *State v. Ferguson*, 519 N.W.2d 50, 52 (S.D.1994); *Delano v. Petteys*, 520 N.W.2d 606, 607 (S.D.1994). Chamley's conviction for the rape of S.Y. as well as his prior oral sexual penetration of A.L. would render him as a perpetrator of criminal pedophilia as now defined by the South Dakota Legislature in SDCL 22–22–30.1.

[¶ 63.] Another factor in balancing probative versus prejudicial is factual similarity. *See, Moeller*, 548 N.W.2d at 475 ("In allowing bad acts evidence to prove . . . specific intent, our cases have routinely focused on two im-portant factors: (1) similar victims, and, (2) similar crimes. *See State v. Christopherson*, 482 N.W.2d 298, 301–02 (S.D.1992); *Werner*, 482 N.W.2d at 289–90; *State v. Perkins*, 444 N.W.2d 34, 38 (S.D.1989); *State v. Titus*, 426 N.W.2d 578, 580 (S.D.1988); *Thomas*, 381 N.W.2d at 236–37; *State v. Roden*, 380 N.W.2d 669 (S.D.1986); *State v. Means*, 363 N.W.2d 565, 568 (S.D.1985)"). The incidents in the instant case are similar in that: 1) Chamley had an established and trusted relationship with a victim's mother; 2) Chamley exposed himself; 3) the touching occurred when the mother was not present; 4) there was digital penetration; 5) the children were girls, between 8 and 9 years old; and, 6) Chamley fondled the breasts of the victims underneath their clothing. Additionally, it appears Chamley has a pattern of exposing himself and waiting to see if the victim(s) tells anyone before trying something bolder. Had the opportunity presented itself, and had not the mother of one of the children been running in and out of the tent (a factor that was not present in the prior sexual contacts), Chamley's other behaviors of masturbating and oral sex may well have occurred. "[W]hile a purse snatcher can repeat his crime often and almost immediately, a child molester must get children in a situation where he can force his sexual desires upon them." *Christopherson*, 482 N.W.2d at 302. Chamley seized an opportunity for gratification when it presented itself, and because he no longer had a live-in victim, the circumstances necessarily did not present the same opportunities as the incidents with his step-daughter; however, there were suffi-

24. In *Hendricks* the United States Supreme Court upheld a Kansas statute which authorized commitment of a pedophile after the pedophile had served his prison sentence for sex crimes as not violative of due process, double jeopardy or the ex post facto clause. In so doing, the Court relied upon the following statutory findings of the Kansas Legislature:

"[A] small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the [general involuntary civil commitment statute].... In contrast to persons appropriate for civil commitment under the [general involuntary civil commitment statute], sexually violent predators generally have anti-social personality features which are unamenable to existing mental illness treatment modali-ties and those features render them likely to engage in sexually violent behavior. The legislature further finds that sexually violent predators' likelihood of engaging in repeat acts of predatory sexual violence is high. The existing involuntary commitment procedure ... is inadequate to address the risk these sexually violent predators pose to society. The legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of its population are very long term and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the [generally involuntary civil commitment statute]." Kan.Stat.Ann. § 59–29a01 (1994). 65 USLW at 4565.

cient similarities in the acts perpetrated for a judicial mind to find the prejudicial effect did not substantially outweigh the probative value.

[¶ 64.] Additionally, in this case, the 404(b) evidence was testimonial. We have always held that the trial court is in the best position to judge testimonial evidence, and this general rule applies also to 404(b) evidence arrived at through testimony. *State v. Johnson,* 316 N.W.2d 652, 654 (S.D.1982) (quoting *United States v. Maestas,* 554 F.2d 834, 836 (8th Cir.1977) ("In making that evaluation [probative versus prejudicial], we must give great deference to the [trial] judge, who saw and heard the evidence.")

[¶ 65.] Another consideration in admission of 404(b) evidence is the availability of other evidence. *White,* 538 N.W.2d at 243. In the instant case, on the rape charge, there was no semen or other physical evidence to show the rape occurred. This heightens the probative value of the prior bad acts. *Id.* at 243; *Werner,* 482 N.W.2d at 290. *See also United States v. Ingraham,* 832 F.2d 229, 237 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

[¶ 66.] There was substantial legitimate value in the 404(b) testimony to establish intent and to negate Chamley's claims that he did not commit the charged acts. The prior abuse was not "some collateral matter admitted for the purpose of prejudice." *Ondricek,* 535 N.W.2d at 877.

[¶ 67.] Did the trial court lack "a judicial mind" in view of the law and the facts of this case in arriving at its decision of admissibility? I would submit not. "Another jurist once defined abuse of discretion as shooting at a target. You did not need to hit the bulls-eye but did need to hit the target. I would submit herein the trial court hit the target." *Moeller,* 548 N.W.2d at 506 (Gilbertson, J., dissenting in part and concurring in part). The trial court properly admitted the 404(b) testimony.

[¶ 68.] **2. Did the trial court err in denying Chamley's motion to introduce the McDonald's evidence?**

[¶ 69.] The majority has improperly substituted its judgment for that of the trial court

in holding that the McDonald's evidence is "demonstrably false" under *State v. Sieler,* 397 N.W.2d 89 (S.D.1986). In *Sieler,* we required that the trial court find a prior sexual abuse allegation is "demonstrably false" before we permit its use to cross-examine a victim for impeachment purposes. 397 N.W.2d at 92.

> When using the "demonstrably false" standard, mere denial of the accusation is not enough, [*State v.*] *Kringstad,* [353 N.W.2d 302 (N.D.1984) ] *supra.* It is not enough if the complaints were arguably false, *State v. Demos,* 94 Wash.2d 733, 619 P.2d 968, 970 (1980). In some instances even a not guilty verdict on an asserted false charge may not be enough to make the prior accusations relevant, *State v. Schwartzmiller,* 107 Idaho 89, 685 P.2d 830, 833 (1984).

*Id.* at 92.

[¶ 70.] The majority states that "[t]he fact that the trial court refused to admit the McDonald's evidence means that W.W.'s credibility was not, in the trial court's view, sufficiently diminished by the testimony of Mrs. Pena and L.G. to warrant. its admission." *Supra,* ¶ 27. Yet in the next breath, in total disregard of our well-established rule that we defer to the trial judge on testimonial evidence and from the pages of a cold appellate record, the majority makes its own judgment that the testimony of Mrs. Pena and L.G. was more credible than that of W.W. and S.Y. *See Cowan v. Mervin Mewes, Inc.,* 1996 SD 40, ¶ 8, 546 N.W.2d 104, 109 (1996) (trial judge is in the best position to assess the credibility of the witnesses and the weight to be accorded their testimony). The majority is clearly substituting its judgment for the trial court's when it states: "There can be no doubt that the testimony of W.W. and S.Y. was directly contradicted by defense testimony by Mrs. Pena and L.G." The trial court disagreed: "[A]s I ruled yesterday, there is nothing inconsistent, nor is there any *contradiction* in [W.W.]'s, Mrs. Pena's [25] or ... [L.G.]'s testimony, that all three stories are consistent."

[¶ 71.] The majority takes the next improper step in substituting its judgment for the

---

**25.** The record does not show the trial court

erred. In testimony before this trial judge, Mrs.

trial court in making its own factual finding that the McDonald's testimony of W.W. and S.Y. was demonstrably false. We review a trial court's findings that a prior sex crime allegation was "demonstrably false" under an abuse of discretion standard. *State v. Blalack*, 434 N.W.2d 55 (S.D.1988). "Abuse of discretion means discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Priebe v. Priebe*, 1996 SD 136, ¶ 9, 556 N.W.2d 78, 80 (1996). In this case, the majority appears to have substituted its judgment for the trial court under a de novo review of the McDonald's evidence.[26] It therefore supports its ultimate conclusion on a faulty legal foundation not once, but twice. Because the trial court did not abuse its discretion in finding Chamley failed to prove the McDonald's testimony was "demonstrably false," the McDonald's testimony was not admissible for the purpose of impeaching the victim. It is therefore not necessary to reach the question of whether Chamley would have been prejudiced by its admission.

**[¶ 72.] 3. Was Chamley denied his Sixth Amendment right to self-representation?**

[¶ 73.] At first blush, it would appear that Chamley was improperly denied his right to self-representation. Clearly, the trial court must recognize that a defendant has just as much right to represent himself as he does to hire or be provided a licensed attorney. *State v. Raymond*, 1997 SD 59, ¶ 8, 563 N.W.2d 823, 825 (1997). In order to deny a defendant the right to represent himself, there must be a showing that the defendant is not capable or did not make a knowing, intelligent and voluntary waiver of the right to counsel. *Id.* at ¶ 11, 563 N.W.2d at 825. "A defendant is presumed not to have waived his right to counsel unless he can demonstrate to the court that his waiver and request to represent himself is knowing, intelligent, and voluntary." *Id.* at ¶ 9, 563 N.W.2d at 825, (citing *Hamilton v. Groose*, 28 F.3d 859, 861-2 (8th Cir.1994)).

[¶ 74.] In the instant case, however, we must look to the defendant. Chamley is a defrocked attorney and is well acquainted with the legal system. In addition, he has a grudge against the system [27] and against this Court in particular. *See, In re* Chamley, 349 N.W.2d 56 (S.D.1984) (at one point, Chamley tore up his state bar license and mailed pieces to various individuals, including the

Pena admitted the only time she could account for Chamley's whereabouts is during the brief moment that S.Y. approached her in the order line and identified Chamley. Mrs. Pena testified that when he was pointed out to her, Chamley immediately got up and went toward the exit, but she did not see him leave because the exit was out of her line of sight and her back was turned. At the time, Mrs. Pena and another teacher had been at the McDonald's for 10 to 15 minutes and were supervising 46 third-graders who were in various stages of ordering and eating lunch. S.Y. and W.W. had already received their food and were eating, seated behind a condiment stand that blocked Mrs. Pena's view of them. Mrs. Pena could not see the rest room from where she was standing. The trial court could find there was no conflict: Mrs. Pena admitted all the incidents complained of could have occurred without her seeing them.

26. While the majority claims that the trial court "did not specifically rule on whether W.W.'s McDonald's accusation was demonstrably false[.]" The trial transcript indicates otherwise:

Court: "Now you're talking about an allegation of a prior accusation being demonstrably false, and what she did in McDonald's purported-ly rules [sic] was said before demonstrably false; is that right.... Okay. Having reviewed the case [*Sieler, supra*], I don't feel it's applicable. There is nothing here that would make the allegations demonstrably false."

27. At his bond reduction hearing, Chamley frequently interrupted and argued with the magistrate; said he didn't know why he bothered talking to the magistrate, because it was like talking to a "dead wall"; accused the magistrate of being prejudiced; and, asked the magistrate if he wanted Chamley to "beg" him for a bond reduction. When the magistrate threatened to have Chamley removed from the courtroom and have his court-appointed counsel finish the hearing, Chamley responded. "She's not my counsel, and don't you say she is my counsel and don't you imply for a moment that you can charge me."

At the preliminary hearing, he told the same magistrate: "if you proceed, I think it will be at your jeopardy, not at my jeopardy." At his trial, the prosecutors reported to the court that Chamley had commented loud enough for them to hear, "I'm facing life. You guys are facing death." Chamley responded that he never meant it to threaten the prosecutor.

Chief Justice of this Court).[28]

[¶ 75.] In addition, Chamley has played the other side of this Sixth Amendment issue with the Court before. In *State v. Chamley*, 310 N.W.2d 153 (S.D.1981), Chamley was charged with a misdemeanor assault, and the trial court granted Chamley's request to represent himself. Following his conviction, Chamley appealed to this Court on the basis that the trial court failed to conduct an adequate on-the-record colloquy to determine if Chamley knowing, intelligently and voluntarily waived his Sixth Amendment right to counsel. *Id.* at 154. We held that he had. *Id.*

[¶ 76.] As pointed out by the State, in the case now before us, Chamley vacillated between representing himself and having court-appointed counsel. A defendant may not misuse the right to represent himself in order to delay or disrupt his trial. *Hamilton*, 28 F.3d at 862. The record shows this is precisely what Chamley did. The magistrate noted on the record that at Chamley's bond hearing, Chamley first stated his court-appointed counsel was not his attorney, then stated she was, and stated again at the hearing she was not. At the preliminary hearing, which had already been continued once at Chamley's request, Chamley initially stated he wanted his court-appointed attorney, and then dismissed her, stating, "I just decided that I would not allow the preliminary hearing to proceed, and if I had to dismiss her [his court appointed counsel], that's what I'd have to do to get the proceedings stopped." [29] When asked at the preliminary hearing about the status of his representation, Chamley

refused to respond, stating he wanted a hearing on a motion first.[30] At trial, despite his earlier protestations that he wanted to represent himself, Chamley waived his right to be present during jury instructions and in fact was not present. The trial court apparently recognized Chamley's cat-and-mouse game, stating that the court did not want subsequent hearings turned into a "circus or charade." Not only did the trial court have the opportunity to see and listen to Chamley, it had its seventeen years of experience in dealing with a multitude of criminal defendants upon which to base its decision as to Chamley's real motives.

[¶ 77.] Chamley's request to represent himself not only was not "unequivocal," it was intended to create delay and to cause confusion about his self-representation in an attempt to "set up" the trial court for purpose of appeal. This is a clear cut case of "invited error."

> The doctrine of "invited error" embodies the principle that a party will not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit. It has been held that for the doctrine of invited error to apply it is sufficient that the party who on appeal complains of the error has contributed to it.

*Taylor Realty Co. v. Haberling*, 365 N.W.2d 870 (S.D.1985) (quoting 5 Am.Jur.2d *Appeal and Error* § 713). We should not permit a defendant to lie in the weeds waiting for an opportunity to ambush the trial court on appeal. Under the circumstances of this

---

**28.** None of the current members of this Court were on the Supreme Court bench at the time of the 1984 appeal.

**29.** Once the court refused to continue the hearing, and stated the hearing would proceed with Chamley's counsel representing him, Chamley stated, "If that is the case, I demand she withdraw from the case and not represent me." Chamley's request to represent himself can hardly be characterized as "unequivocal" when he thus places a condition on her removal. In addition, the court determined that Chamley was using his request to proceed pro se as a way of delaying the hearing and intimidating the young children who were the witnesses/victims. When given the opportunity to cross-examine the witnesses himself, Chamley refused, at one point

saying, "I'm not going to acknowledge this as a preliminary hearing in any way, your Honor."

**30.** The motion, which requested a new preliminary hearing, had not been filed, nor was it provided to the state. The trial court did not foreclose Chamley from representing himself at this stage, stating: "Mr. Chamley, here's the way it stacks up. You can either represent yourself, you can hire your own attorney, or you're entitled to court-appointed counsel." The court scheduled a hearing on Chamley's motion to be held within two weeks, but Chamley nonetheless demanded the issue be taken up immediately, stating it would solve the problem of his representation because the motion showed his attorney was incompetent.

case, the trial court did not err in refusing to allow Chamley to represent himself.

## CONCLUSION

[¶ 78.] Chamley was entitled to a fair trial. I would respectfully submit he got one.

[¶ 79.] The resolution of this case is as unfortunate as any case this writer has reviewed. We are not dealing with the abuse of money or land, but of the most vulnerable humans in our society, trusting children. Based on the majority decision, W.W. and S.Y., young girls who were found by the veteran trial judge to be credible and truthful and who the jury determined to be victims of sexual abuse, are now found by the majority to have given "demonstrably false" testimony, a/k/a they lied. They will now be put through the horror of a second trial. The majority will authorize W.W. and S.Y. to be forced to be cross-examined concerning previously properly forbidden territory by the very person who was found by the jury to have perpetrated the vicious acts upon them, the pro-se Chamley. Chamley has already attempted to intimidate them by trying to contact the girls personally while this case was pending and later after he was incarcerated, by telephone.

[¶ 80.] Beyond that, this decision seeks to overturn, or at best ignore, settled case law and strike out on new courses previously rejected by this Court.

[¶ 81.] I would affirm the trial court in all respects.

[¶ 82.] STEELE, C.J., joins this special writing.